50 F.3d 1464
 63 USLW 2601, 129 Lab.Cas. P 11,296,
10 IER Cases 612
 INTERNATIONAL ALLIANCE OF THEATRICAL AND STAGE EMPLOYEES AND
MOVING PICTURE MACHINE OPERATORS, AFL-CIO,
Plaintiff-Appellant,
v.
COMPACT VIDEO SERVICES, INC.; Compact Video Group, Inc.;
Meridian Studios; Image Transform, Inc.; and
John Donlon, Defendants-Appellees.
 No. 93-56664.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 7, 1994.
Decided March 23, 1995.
 
 Ira L. Gottlieb, Taylor, Roth, Bush & Geffner, Burbank, CA, for plaintiff-appellant.
 Marita T. Covarrubias, Richard W. Kopenhefer, Raymond W. Thomas, Loeb & Loeb, Los Angeles, CA, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: BROWNING, GOODWIN, and FERGUSON, Circuit Judges.
 Opinion by Judge GOODWIN; Dissent by Judge FERGUSON.
 GOODWIN, Circuit Judge:
 
 
 1
 Legislation is enlisted from time to time in the chronic tension between labor and management, to the advantage of one side and to the disadvantage of the other. In this case we decide whether the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. Sec. 2101 et seq., applies to this contest between a union and a selling corporation which tried to rid itself of the union.
 
 
 2
 The selling corporation sold its unionized business to a nonunion entity. The acquiring entity kept on nearly all of the old work force, though at slightly lower rates of pay and without the fringe benefits that had been called for in the collective bargaining agreement between the union and the selling corporation. A handful of workers either were not invited to remain with the new owner, or declined to do so.
 
 
 3
 Reserving its rights and remedies by instituting proceedings before the National Labor Relations Board, and judicial proceedings under relevant sections of the National Labor Relations Act, the union also commenced these WARN proceedings in the District Court to obtain for each former employee of the selling corporation sixty days salary and benefits, as a penalty for the seller's failure to give the workers sixty days' advance notice of an "employment loss."
 
 
 4
 The District Court on summary judgment ruled that employees who find themselves transferred from the payroll of one company to the payroll of another as the result of a sale have not suffered a compensable "employment loss" under WARN, whatever may be the consequences of that scheme for purging a work force of its unionized character in appropriate proceedings before the NLRB, or under other provisions of labor law. Because the District Court correctly construed the applicable law, the summary judgment is affirmed.
 
 Background
 
 5
 In July 1993, Compact Video Services, Inc., Compact Video Group, Inc., Meridian Studios, and Image Transform, Inc. ("Compact") owned a videotape post-production business in Burbank, California. The business employed 314 people (the "Compact employees"). International Alliance ("The Union") represented about a third of them. By July, 1993, Compact was saddled with heavy corporate debt, and was looking for a way out. ATS Acquisition Corp., Inc. ("ATS"), a holding company, agreed to renegotiate and restructure Compact's debt with Compact's lenders, and release Compact from responsibility for its debt. In return, ATS would acquire Compact's Burbank videotape post-production business.
 
 
 6
 Sometime in late July, the Union learned that the Hollywood Reporter was advertising employment openings at a company to be formed pending acquisition of the assets of Compact. On July 29, the Union wrote to Compact's president, seeking information about the sale. The following day, July 30, Compact's CEO, John Donlon, sent a letter to the Compact employees informing them that its business was going to be sold, and that "after the sale closes, you will no longer be employed by the Compact companies." Donlon encouraged the Compact employees to apply with ATS for employment. That same day, Robert Watson, ATS's Chairman and CEO, wrote a letter to the Compact employees encouraging them to apply for employment with ATS.
 
 
 7
 The sale closed the week of August 2, 1993. Prior to the sale's closing, ATS notified 309 of the 314 Compact employees that it would keep them on board. Three Compact employees declined the invitation to work under the new management. Another 306 Compact employees accepted employment with ATS. They became ATS employees immediately upon the sale of Compact to ATS, without missing a day's work.
 
 
 8
 Many of the new ATS employees were paid less than before the sale, and were afforded fewer "fringe" benefits. The Union estimates that of approximately 105 Union members hired by ATS, seventy-three took pay cuts. All employees represented by the Union are now required by ATS to make health plan co-payments, and many of them lost Union pension plans. ATS apparently does not recognize the Union's representation of the former employees of Compact Video Services, Inc. ATS considers its employees to be "at will," and subjects them to a 180 day "probationary period" (which period, presumably, has since expired for all former Compact employees).
 
 
 9
 On August 11, 1993, the Union filed this action against Compact, seeking damages under WARN because Compact did not give its employees 60 days advance notice of their "mass layoff." In September 1993, the Union filed a second action against Compact and ATS, alleging violations of federal labor law and collective bargaining agreements.
 
 
 10
 The Union demanded discovery of the Compact-ATS sales agreement. Compact cried "fishing expedition!" The Union's ex parte motion to discover the agreement was denied. On September 13, 1993, Compact moved for summary judgment. In support of its motion, Compact submitted the declaration of its Chief Financial Officer, John Sabin. Sabin stated that he had personal knowledge that a sale had taken place. It was undisputed that only five Compact employees were not retained by ATS.
 
 
 11
 The Union opposed summary judgment on the ground that Compact had not adequately shown that a sale had taken place, because Compact CEO Donlon had stated in a deposition that no one in Compact management (including Sabin) had participated in the negotiations for the transaction, and because Compact had not produced the sales agreement. The Union also moved for a continuance under Federal Rule of Civil Procedure 56(f), seeking leave to discover more about the Compact-ATS sales agreement.
 
 
 12
 The District Court denied the Union's Rule 56(f) motion, and granted summary judgment to Compact. The District Court reasoned that there were no triable issues of material fact, and that additional discovery could not possibly create any, in light of the court's conclusion that fewer than fifty employees had suffered an "employment loss" as defined in WARN.[1]
 
 Standard of Review
 
 13
 We interpret the provisions of WARN de novo. We review the District Court's denial of discovery pursuant to Rule 56(f) for abuse of discretion. Qualls v. Blue Cross of California, 22 F.3d 839, 844 (9th Cir.1994). There can be no abuse of discretion where the movant failed to show how allowing additional discovery would have precluded summary judgment. Id.
 
 WARN Applied
 
 14
 WARN requires that an employer give 60 days advance warning before any "plant closing" or "mass layoff." A "plant closing" is a shutdown of a single site of employment that causes an "employment loss" for fifty or more employees during a thirty-day period. 29 U.S.C. Sec. 2101(a)(2). A "mass layoff" is any other "employment loss" within any thirty-day period for either (a) fifty to 499 full-time employees, if the number laid off equals thirty-three percent of the work force; or (b) 500 full-time employees. 29 U.S.C. Sec. 2101(a)(3). Thus, when fewer than fifty full-time employees suffer an "employment loss," WARN notice is not required.
 
 
 15
 "Employment loss" is defined as
 
 
 16
 (A) An employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period[.]
 
 
 17
 29 U.S.C. Sec. 2101(a)(6). The Department of Labor ("DOL") added to its final regulations under the Act a comment explaining that the word "termination" is "to have [its] common sense meaning[ ]" as "the permanent cessation of the employment relationship...." 54 Fed.Reg. 16,047 (1989).
 
 
 18
 The Union argues that this case turns on the statement in Donlon's letter: "after the sale closes, you will no longer be employed by the Compact companies." According to the Union, this statement shows that Compact "terminated" its employees, and was therefore under a statutory duty to give them 60 days advance warning. The Union denies that workers shifted from one employer to another as a result of a sale are excepted from the definition of "employment loss." The law, however, is entirely the other way. The statutory language, the legislative history, the regulations, and a persuasive Tenth Circuit opinion confirm the existence of a "sales exception" to WARN.
 
 Section 2101(b) reads:
 
 19
 Exclusions from definition of employment loss
 
 
 20
 (1) In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title. Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.
 
 The accompanying regulation explains:
 
 21
 This provision preserves the notice rights of the employees of a business that has been sold, but creates no other employment rights. Although a technical termination of the seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is only required where the employees, in fact, experience a covered employment loss.
 
 
 22
 20 C.F.R. Sec. 639.6 (emphasis added).
 
 
 23
 As a threshold matter, we address our dissenting colleague's contention that Section 2101(b) does not apply to this case, because we are looking at a sale of assets, not a sale of a business. Compact was a parent corporation, the asset of which was the Burbank videotape post-production business. When Compact sold its assets to ATS, it sold that business. On the facts of this case, the distinction drawn by the dissent is quite without foundation. We conclude that Section 2101(b) applies.
 
 
 24
 In Headrick v. Rockwell Int'l Corp., 24 F.3d 1272 (10th Cir.1994), former Rockwell employees sued Rockwell under WARN, alleging that Rockwell's transfer of control to EG & G amounted to an "employment loss" requiring notice. The Rockwell employees argued that they were "technically" terminated when they ceased to be Rockwell employees, even though they were immediately rehired by EG & G upon the effective date of sale and never "faced the need to readjust, retrain, find new work or seek unemployment compensation...." Id. at 1280 (internal quotations omitted). The Tenth Circuit was not persuaded by this argument. Headrick explained that a sale is not a WARN event: "the obligation to warn employees in the event of a closure or mass layoff skips from seller to buyer, never triggered by the sale. Any argument to the contrary is simply foreclosed by the statute itself." Id.
 
 
 25
 But might a sale be a WARN event if the buyer modifies the terms and conditions of employment after the sale? More to the point, might a sale be a WARN event if the buyer impairs the terms and conditions of employment after the sale? (After all, had ATS increased the salaries and benefits of the Compact employees, making them better off than before, no sentient attorney would clamor to hold Compact liable for the worker's "termination.") In Headrick, the Rockwell employees were retained by EG & G under the same terms and conditions they enjoyed with Rockwell, and EG & G assumed and honored the existing collective bargaining agreement. Id. at 1274. The Compact employees were not so fortunate. Senator Hatch, who worded the sales exception to WARN, commented that "[i]t would seem fairly obvious that if the business continues on as before with no significant changes of any kind, that there would be no need to go through the formal notification process." 134 Cong.Rec. 16,026 (1988) (emphasis added). This comment might be read as the thinnest support for rejecting the application of the sales exception to the facts of this case. Predictably, that's the way the union reads it.
 
 
 26
 WARN's sales exception allocates notice responsibility to the party who actually makes the decision that creates an "employment loss," but "creates no other employment rights." See 20 C.F.R. Sec. 639.6. As we see it, the fact that the Compact employees were taken on by ATS with reduced salary and benefits might be relevant if the question were whether ATS caused them to suffer a covered "employment loss"--and we next shall consider whether these wage and benefits reductions constitute an "employment loss." But the question now is whether the sales exception relieves the seller of WARN notice obligations, and we think that the conduct of the buyer is irrelevant to that. An "employment loss" occurring before the sale is effective is the seller's responsibility. An "employment loss" occurring after the sale is effective is the buyer's responsibility. The sale itself does not implicate WARN at all. Headrick, 24 F.3d at 1281. A sale is still a sale, and the seller is relieved of notice responsibility, even though the buyer causes the seller's former employees to suffer an employment loss.
 
 
 27
 The employment terms to which the Compact employees object went into effect after Compact sold its business to ATS. Contrary to the dissent's intimation, nothing in WARN requires a seller to insist upon a contract term guaranteeing its employees continued employment with the buyer. Had ATS simply decided not to hire any of the Compact employees at all, ATS, not Compact, would have had the responsibility for giving WARN notice.[2] So it is when the buyer, rather than dismissing the seller's employees outright, decides to keep them on at the job, but on less favorable terms.
 
 
 28
 Sale a Sham?
 
 
 29
 If there was a sale, it was not a WARN event. With that point established we would end our discussion, were it not for the Union's suggestion that the Compact-ATS sale was a "sham," that ATS is Compact's "alter ego," and therefore that Compact is still the employer. If there never was any sale, then talk of a "sales exception" is, of course, beside the point. The Union suggests that there was something fishy about the sale, we think, in order to bolster its argument that it should have been permitted to discover the sales agreement. But we are convinced that further discovery was unnecessary, for if there was no sale then Compact could be liable under WARN only if modification of the Compact employees' salaries and benefits is a WARN event, and the plain language of the statute reveals that it is not.
 
 
 30
 Only an "employment loss" is a WARN event. 29 U.S.C. Secs. 2101(a)(2), (a)(3), 2102. An "employment loss" is carefully confined to three instances: "[A]n employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent of each month during any 6-month period[.]" 29 U.S.C. Sec. 2101(a)(6). The Union seems to reason along these lines: a pay and benefits cut is a "loss"; it is a loss that affects one's employment; therefore, it is an "employment loss." It is the syllogism that must fit the statute, not vice-versa. The facts of this case fit neither (A), (B), nor (C). That Congress applied WARN notice requirements to reductions in work hours, in (C), persuades us that WARN does not apply to any other modifications of the terms of employment. We understand that WARN was enacted for employees' protection, but we cannot rewrite it to require employers to give 60 days notice for every wage adjustment and modification of employee handbooks. Employees must look to other sources of law, for example federal labor laws, ERISA, or common law contract principles, to remedy an improper modification of the terms of their employment.
 
 Conclusion
 
 31
 A sale of a business is not a WARN event. The modification of employee salaries and benefits is not a WARN event, either. Since the undisputed facts show that only five Compact employees suffered an "employment loss," summary judgment was proper and the District Court did not abuse its discretion by denying the Union's motion under Rule 56(f).
 
 
 32
 AFFIRMED.
 
 FERGUSON, Circuit Judge, dissenting:
 
 33
 I dissent for the reason that the majority opinion is mistaken in its major premise. The majority rely exclusively on the premise that this is a case in which there was a sale of a business. The undisputed fact that the majority completely ignore is that this case is not about a sale of the business, but merely a sale of assets of the business. That fact is conclusively established by the record. What is unknown is whether the sale was of all the assets or just a part of them. The district court refused to order the agreement to be produced. The majority, like the district court, err in the conclusion that Compact Video Services' ("Compact's") employees were merely "transferred from the payroll of one company to another as the result of a sale" because their major premise, that the sale was a sale of the business, is wrong.
 
 
 34
 On July 30, 1993 Compact notified all 314 of its employees by letter that Compact was selling its assets to ATS Acquisition Corporation ("ATS") during the week of August 2, 1993. Compact's notice explained the impending termination of the current employer/employee relationship and imputed that future ATS hiring decisions were beyond the power or authority of Compact's management. The letter, from Compact CEO John Donlon, read:
 
 
 35
 After the sale closes, you will no longer be employed by the Compact Companies ...
 
 
 36
 I encourage each of you to apply for employment, as I have, with ATS Acquisition Corp. ATS Acquisition Corp. is actively considering its staffing needs and will be sending out offers of employment shortly.
 
 
 37
 29 U.S.C. Sec. 2101(b)(1) allocates the burden of notifying employees faced with a potential employment loss to the party which has made the decision that creates an "employment loss". 20 C.F.R. Sec. 639.4. In assuming that Compact's employees were transferred, the majority ignore the plain language of Donlon's letter and the plain meaning of an asset sale. An asset sale involves only a company's assets; the seller retains corporate liabilities such as the Worker Adjustment and Retraining Notification Act ("WARN") notification requirement. 29 U.S.C. Sec. 2102(a).
 
 
 38
 Additional evidence of the fact that Compact's sale of assets did not include the transfer of any employer liabilities is ATS' letter to Compact's employees on July 30, 1993. ATS' letter notified Compact's employees that ATS was acquiring the assets of Compact, but made no offers of employment. ATS encouraged Compact employees to apply with ATS since it was currently reviewing its staffing needs. An August 2nd application deadline was announced:
 
 
 39
 Many of you may have seen our recent "Help Wanted" notices in trade publications. However, we have not made any final decisions as to personnel and staffing. I am hopeful that you will apply for employment with our new company and I encourage you to submit an application no later than Monday, August 2, 1993, which is the application deadline. If you do not apply, we will assume that you do not want to be considered for employment ... After we determine our personnel needs, we will issue written offers to individuals selected for employment at ATS.
 
 
 40
 Neither ATS nor Compact ever suggested to Compact's employees that the impending sale would involve the transfer of Compact employees to ATS employment. While both letters encouraged Compact employees to apply for jobs with ATS, both also implied that ATS hiring decisions were to be made on an ad hoc basis in response to ATS' perceived staffing needs for its new company and that no agreement had been reached between Compact and ATS providing for the automatic "transfer" of employees. No indication was given as to whether or not ATS would hire any of Compact's employees. ATS acted no differently than any other company seeking employees on the open market.
 
 
 41
 On August 3, ATS extended offers of employment to selected members of its applicant pool. In its offers, ATS made no mention of assuming Compact's responsibilities either as a business or as an employer. Applicants were given until the next day, the 4th, to respond; all offers were void after August 4. The sale of assets closed on August 5. Because of the constricted time frame of the ATS application process for former Compact employees, the majority is correct in noting that Compact employees who were accepted by ATS did not miss a day of work. Finding a new job on the day after your prior employment ends, however, is not synonymous with being "retained" in your employment.
 
 
 42
 Viewing the facts in the light most favorable to the Union, as summary judgment requires, Compact employees lost their jobs. In addition, the record raises a genuine issue of material fact which makes summary judgment inappropriate. Did the sale of assets encompass more than a traditional sale of assets and provide for the transfer of workers and corporate liability? The district court erroneously weighed the evidence before it when it concluded that the sale of assets agreement involved the sale of the business and so, only technical job losses. Absent the discovery of the sale of assets agreement between Compact and ATS, a genuine issue of material fact remains and it cannot be known whether the sale was a traditional sale of assets leaving Compact responsible for its corporate liabilities or a sale of the business as contemplated by WARN, 29 U.S.C. Sec. 2101(b)(1).
 
 
 43
 WARN was enacted in order to ensure that employees faced with an impending employment loss have some time in which to pursue additional training for a new career or alternative employment opportunities. 20 C.F.R. Sec. 639.1(a). WARN, therefore, requires an employer to provide 60 days notification prior to a mass layoff or closing which results in an "employment loss" for fifty or more employees. 29 U.S.C. Secs. 2101(a)(3), 2102(a). WARN exempts the sale of a company from this notification requirement if the sale results in only "technical" job losses since such technical job losses do not pose any real threat to employees' livelihoods.
 
 
 44
 ATS' purchase of Compact's assets was not exempted by 29 U.S.C. Sec. 2101(b)(1) because it resulted in substantial job losses. See Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 778 F.Supp. 297, 314 (E.D.La.1991), aff'd in part and rev'd in part, 15 F.3d 1275 (5th Cir.1994) (affirming the employer's violation of WARN, but reversing the calculation of damages). Compact's own Chief Financial Officer, John Sabin, admitted that Compact's sale to ATS was only a sale of assets. Nevertheless, the majority mischaracterizes ATS' hiring of Compact's employees as a "transfer". A sale of assets, however, involves only assets, not employees. Unlike the sale of a business itself, a sale of assets transfers a seller's liability only if one of the following four exceptions apply:
 
 
 45
 (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
 
 
 46
 (2) The transaction amounts to a "de facto" consolidation or merger;
 
 
 47
 (3) The purchasing corporation is merely a continuation of the selling corporation;
 
 
 48
 (4) The transaction was fraudulently entered into in order to escape liability.
 
 
 49
 Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d 1260, 1263 (9th Cir.1990). The record is completely silent in establishing any of the four exemptions.
 
 
 50
 The majority sets a dangerous precedent by upholding the grant of summary judgment in this case. According to the reasoning of the majority, a manufacturing plant can conclude an agreement to sell only its fleet of trucks. The sale can result in an employment loss for all 100 employees previously employed in the loading and driving of the trucks. Nevertheless, the seller, under the reasoning of the majority, will be exempted from WARN's notification requirement because the manufacturer who sold the trucks qualifies for WARN's sales exemption, 29 U.S.C. Sec. 2101(b)(1). The majority fail to understand WARN's sale of a business exemption.
 
 WARN defines "employment loss" as:
 
 51
 (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period ...
 
 
 52
 29 U.S.C. Sec. 2101(a)(6). All 314 of Compact's employees suffered an employment loss when they were specifically terminated by Compact on August 4, 1993. As both Compact's and ATS' letters demonstrate, ATS' decisions to hire Compact employees were made on an ad hoc basis after the employees had been notified of their impending termination from Compact and had applied, as individuals, to ATS. Those Compact employees subsequently hired by ATS were not "retained", but were hired, just as they might have been hired by any company then accepting applications for employment.
 
 
 53
 As a result of Compact's unannounced asset sale to ATS, Compact's employees were faced with the very situation that WARN was enacted to prevent. On only a few days notice, they learned that their employment was ended. The new jobs offered by ATS had very different wage and benefit compensation and were structured not as salaried, but as at-will employment. The way the majority read WARN, Congress intended only to protect those employees who are unable to find any alternative employment. WARN is not triggered by a specified length of employment loss, but by any employment loss. The sale of a business is exempt, but the sale of assets is not legally equivalent to the sale of a business. Holding, as the majority does, that post-termination employment such as that offered by ATS relieves the seller of WARN liability eviscerates the protections against unprecipitated termination which WARN was enacted to guarantee.
 
 
 54
 Compact and the majority rely on Headrick v. Rockwell Int'l Corp., 24 F.3d 1272 (10th Cir.1994), to support the conclusion that WARN obligations were not triggered by the asset sale. Headrick, however, is distinguishable. In Headrick, while the transaction involved a transfer of assets, the transferee explicitly agreed to assume the transferor's liabilities relative to the plant's operation, all employer's responsibilities, and did so with the expectation that the facility would be operated with the transferor's former employees. The transaction was similar to the sale of a business except for the fact that the transferor did not own the business. All the transferee had was a plant management contract with the government. It should be noted that the transaction in Headrick meets the first exception in Louisiana-Pacific, "the purchasing corporation expressly or impliedly agree[d] to assume the liability." Louisiana-Pacific, 909 F.2d at 1263. Here, there was no assumption by ATS of any employer responsibilities or any other obligations.
 
 
 55
 The district court erred by granting Compact's motion for summary judgment. In granting a motion for summary judgment a court is required to review the evidence in the light most favorable to the nonmoving party and determine that there exist no genuine issues of material fact. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). The undisputed facts of this case show that the sale at issue is a sale of assets. A sale of assets is presumed not to involve a transfer of employees; therefore, a genuine issue of material fact exists as to whether or not Compact's sales agreement made provisions for a transfer of Compact's employees. Reviewing the evidence in the light most favorable to the Union, Compact terminated the employment of all of its employees on the date that it sold its assets to ATS. The sales exemption of WARN is not applicable to this case and a grant of summary judgment is in error.
 
 
 
 [1]
 In subsequent proceedings before the NLRB, Compact finally did fork over a copy of the sales agreement to the Union
 
 
 [2]
 That's the Department of Labor's view, and we share it:
 WARN creates an absolute division of responsibility for giving notice between a buyer and a seller of a business; the seller is liable to give notice of covered actions which occur up to and including the date (time) of sale and the buyer is responsible thereafter.
 ..
 One commenter suggested that the regulations make it clear that if the employees of a business that has been sold are not rehired by the buyer, the responsibility for giving notice is on the seller. The Department believes that such an allocation of responsibility is directly contrary to the statutory language and intent. If a plant closing occurred as a result of the buyer's decision not to rehire the seller's workers, and the closing occurred after the effective time of the sale, the buyer is responsible for giving notice. This view is consistent with the statutory provision that the employees of the seller become the employees of the buyer immediately after the sale ... and with the reality of allocating responsibility for notice to the party to the transaction that actually makes the decision to order the plant closing or mass layoff....
 
 
 [54]
 Fed.Reg. 16,052 (1989) (emphasis added)