# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 04-3679/3880
_____

| | | |
|---|---|---|
| Charles T. Wilson; Caryless Vondran; | * | |
| Willie Ferell; Onixe Anderson; | * | |
| Dallas W. Watlington; Tommy | * | |
| Humphrey; Neartis Clark; Alvin | * | |
| Smith, Jr.; Tommie Outley; Billy | * | |
| Fleming; Lloyd A. Nichols; Gary R. | * | |
| Thomas; Alvin Smith; Jimmy L. | * | |
| Dooley; Kenneth Rogers; William | * | |
| Dawson; Samuel J. Cullum; Thomas | * | |
| Anthony; Corey Amos; Bobby Hedrick; | * | |
| Charles Busby; Larry Foster; Danny | * | |
| Doler; Percy Graham; Cora L. Jamison; | * | |
| Robert Thorn, Jr.; Jessie Hawkins; | * | |
| Curtis Bradley, Jr.; Donald Barger; | * | |
| Almos Andrews; Jesse Lee Ferrell; | * | Appeals from the United States |
| Eddie Lee Hodger; Leodis Seawood; | * | District Court for the |
| Roy Lee Coleman; Larvan Hawkins; | * | Eastern District of Arkansas. |
| Steven Dearing; Tracy Hill; Jeffery | * | |
| Wright; John Brooks Jones; Clarence | * | |
| Treat; Saundra House; Kevin | * | |
| Lawrence; Aaron Barton; Odis L. | * | |
| Barton; Manuel Sanchez, Jr.; Stanley | * | |
| Barton; Evelyn Burgess; Bennie | * | |
| Wilson; Kristi McCain; Leo Deaviser; | * | |
| Ronald McFadden; Kendle Williams; | * | |
| Willie K. Ponder; George Robert | * | |
| Lawrence; Elmo Hilliard; Sammie | * | |
| Sinclair; Charlie L. Huckaba; Calvin | * | |
| Smith; Recorder Henderson; Huester | * | |
| Barton; Ruby Hall; Michael Stanley | * | |
| Norviel; Lewis E. Cook; Isacc Rogers; | * | |

Carlton Hoggard; Robert Nelson;                    *
Lincoln Taylor, Jr.; Terry L.                      *
Gardner; Willie White; Walter L.                   *
Taylor; Barbara K. Dye: Troy                       *
Sparkmon; Paul Roger Clardy; Lester                *
Taggart; Andy Anderson; Daron                      *
Sparkman; Lee A. Henderson;                        *
Jermaine Davis; Charles A. Hughes;                 *
Donald Strong; James Nobles; Floyd                 *
Stokes; Clyde V. Clark; Richard                    *
Thornton; Ronnie C. McShan; James E.               *
Fingers; Donald R. Hall; Billy J.                  *
Jones,                                             *
                                                   *
     Appellees/Cross-Appellants,                     *
                                                   *
     v.                                              *
                                                   *
Airtherm Products, Inc.,                           *
                                                   *
     Appellant/Cross-Appellee.                        *

_____

Submitted:  November 16, 2005
Filed:  February 3, 2006
_____

Before MURPHY, BOWMAN, and GRUENDER, Circuit Judges.
_____

BOWMAN, Circuit Judge.

Former employees of Airtherm Products, Inc. (API) sued API for failing to notify them of a plant closing as required by the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. §§ 2101–09 (2000), before API sold its

business to Airtherm LLC (ALLC). Concluding that API violated the WARN Act by terminating its employees' employment without guaranteeing that ALLC would hire the employees after the sale was concluded, the District Court granted summary judgment to the former employees and awarded damages in the amount of $515,661.92. Reviewing de novo the District Court's grant of summary judgment, Smullin v. Mity Enter., Inc., 420 F.3d 836, 837 (8th Cir. 2005), we conclude that the WARN Act's sale-of-business exclusion, 29 U.S.C. § 2101(b)(1), protected API from liability in the circumstances of this case. Therefore, we reverse.

I.

API formerly engaged in the business of manufacturing heating and air conditioning products. In 2000, ALLC's parent company, Mestek, Inc., which also manufactured heating and air conditioning products, became interested in purchasing API's business. When Mestek formed ALLC as a subsidiary for the purchase of API, Mestek decided to use the name Airtherm because that name had value in the heating and air conditioning market. On May 24, 2000, API and ALLC executed an Asset Purchase Agreement (Purchase Agreement) for the sale of API's manufacturing business to ALLC. Under the Purchase Agreement, ALLC agreed to offer employment to all of API's employees. An exhibit appended to the Purchase Agreement contained a list of API's employees. Closing was scheduled for June 30, but the parties did not close the sale on or before that date. On August 21, API and ALLC executed the First Amendment to Asset Purchase Agreement (Amended Purchase Agreement). The Amended Purchase Agreement replaced the section of the Purchase Agreement that included ALLC's promise to offer employment to all of API's employees with a section that included the following promise: "Effective on the next working day following the Closing Date, [ALLC] (a) shall offer employment to all salaried and clerical employees of [API] in St. Louis and Arkansas; and (b) shall offer employment to employees within the bargaining unit represented by the

-3-

[union]." Joint Appendix at 138. The Amended Purchase Agreement also changed the closing date from June 30 to August 25. The Amended Purchase Agreement added provisions under which ALLC agreed to indemnify API for WARN Act violations and API agreed to notify the union in writing about the decision to close the manufacturing plant and allow the union to request bargaining over the effects of the plant closure. Specifically, API agreed to allow ALLC to approve the contents of the letter to the union, and once approved, ALLC promised to indemnify API for any liability under the WARN Act.[1]

On August 22, ALLC assured API in writing that ALLC would "hire a substantial number of [API's] current employees" such that "[t]he jobs of fewer than 50 people will be affected by termination." Id. at 99. The letter also included an "Employment Application Schedule" to be posted for API's employees so they would know that ALLC would accept applications from the employees on Monday, August 28, and on Tuesday, August 29. Id. at 100. In an August 23 letter from API's attorney to the union representing some of API's employees, API stated that it was "in the process of being sold" to ALLC and notified the union that it was exercising its rights under the labor agreement's "Severance Allowance" clause "to close the plant, terminate the bargaining unit employees, and pay all eligible employees their severance pay." Id. at 144. The letter also stated, "It is [API's] understanding that after any sale is concluded [ALLC] will begin taking applications for employment on Monday, August 28, 2000, at 8:30 a.m. It is hoped that all of [API]'s current employees will make application for employment with [ALLC]." Id. at 145.

_____

[1]In other proceedings, the union representing API's employees filed charges against API and ALLC with the National Labor Relations Board regarding the sale of API's business. The charges dealt with such labor law issues as effects bargaining and successor employer. The parties settled those charges.

The sale closed on August 25, the same day API terminated the employment of its employees. By September 25, ALLC had hired "a substantial number of former [API] employees."[2] Wilson v. Airtherm Prods., Inc., No. 2:01 CV 00055-WRW, 2001 WL 34818807, at *2 (E.D. Ark. Sept. 10, 2001). In March 2001, a number of API's former employees, including those hired by ALLC, sued API for failing to give notice of a plant closing under the WARN Act. The District Court granted summary judgment to the employees. In deciding this appeal, we do not address the majority of issues raised by API or the employees. Instead, we focus solely on the District Court's interpretation and application of the WARN Act's sale-of-business exclusion.

## II.

The WARN Act requires an employer to provide written notice to employees at least sixty days before a plant closing. 29 U.S.C. § 2102(a)(1). The purpose of the notice requirement is to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a) (2005). Although the notice requirement may seem straightforward, its application often depends on the WARN Act's technical definitions. For instance, the WARN Act defines plant closing as "the permanent or temporary shutdown of a single site of employment . . . result[ing] in an employment loss . . . during any 30-day period for 50 or more [full-time] employees." 29 U.S.C. § 2101(a)(2). The WARN Act defines an employment loss as "an employment termination, other than a discharge for cause, voluntary departure, or retirement." Id. § 2101(a)(6)(A).

---

[2]The parties dispute the number of former API employees hired by ALLC. Because our decision does not rest on this information, we will not scour the record to pin down the exact number.

Critical to this case, however, is the WARN Act's exclusion of sales of businesses from what constitutes an employment loss:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing . . . up to and including the effective date of the sale.  After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing . . . .  Notwithstanding any other provision of this chapter, <u>any person who is an employee of the seller</u> (other than a part-time employee) <u>as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale</u>.

Id. § 2101(b)(1) (emphasis added).  This sale-of-business exclusion stresses that the WARN Act does not automatically require a seller of a business to give notice to its employees that their employment will be terminated as a result of the sale.  The regulations explain, "Although a technical termination of the seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is only required where the employees, in fact, experience a covered employment loss."  20 C.F.R. § 639.6.  Therefore, we must apply the sale-of-business exclusion to the facts of this case to determine whether API—as the seller—was required to give notice to its employees of a looming employment loss due to a plant closing.

The plain language of the sale-of-business exclusion supports API's contention that the WARN Act did not require it to provide notice to its employees of a plant closing.  Even though a seller of a business technically terminates the employment of its employees—it would be difficult to imagine a sale of a business as a going concern where the seller does not terminate the employment of its employees—the WARN Act does not focus on technical terminations.  See id.  Instead, the WARN Act creates a system that allocates notice responsibility between the seller of the business and the buyer of the business, and only the party actually causing

employment loss due to a plant closing is required to provide WARN Act notice. As long as the seller's employees are employed by the seller on the effective date of the sale, those employees automatically are considered to be employees of the buyer "immediately after the effective date of the sale" for purposes of the WARN Act. 29 U.S.C. § 2101(b)(1).

In addition to the WARN Act's plain language strongly suggesting that API, as the seller of a business, had no WARN Act responsibility to provide notice of a plant closing in the circumstances of this case, our Circuit's recent decision in Smullin also supports API's position. 420 F.3d at 836–41. Similar to what happened in this case, the seller in Smullin terminated the employment of its employees on a Friday, the day it sold its Arkansas manufacturing plant as a going concern to the buyer. Over the weekend, the buyer interviewed and hired forty-four of the plant's sixty-eight employees. On the following Monday, the plant continued operating under the buyer's ownership. The seller's former employees sued the seller for violating the WARN Act by terminating the employment of all sixty-eight employees without proper notification. The district court granted summary judgment to the seller, and the Circuit affirmed. Id. at 837.

Writing for the Court, Chief Judge Loken recognized that fewer than fifty employees suffered an employment loss because the buyer immediately hired all but twenty-four of the seller's employees. Thus, the Court concluded that "WARN Act notices were required only if the buyer's hiring must be ignored," which forced the Court to consider § 2101(b)(1)'s sale-of-business exclusion. Id. at 838. The plaintiffs argued that the sale-of-business exclusion did not apply "because the sale took the form of a sale of assets, and the plant's employees were terminated by [the seller] with no right to be rehired by the buyer." Id. at 839. Rejecting this argument, the Court stated that the sale-of-business exclusion "clearly connotes any transaction that transfers all or part of the employer's overall operations as a going concern." Id.

Expounding on "this functional, common sense approach," i.e., asking whether the sale of the business involves merely the sale of assets or whether it is a sale of a business as a going concern, the Court noted that this approach "is consistent with the purposes of the WARN Act because the buyer of a going concern is likely to retain a substantial proportion of the employees of the on-going business." Id. The Court further opined that "defining the exclusion in this generic fashion promotes compliance with the [WARN] Act because buyers and sellers know when a transaction is intended to transfer a going concern and can determine who must give the WARN Act notice if a covered employment loss is likely to occur." Id.

Thus, the Court recognized that when a case involves simply a sale of assets, see, e.g., Burnsides v. MJ Optical, Inc., 128 F.3d 700, 702–03 (8th Cir. 1997), cert. denied, 523 U.S. 1119 (1998); Oil, Chem. & Atomic Workers Int'l Union v. CIT Group/Capital Equip. Fin., Inc., 898 F. Supp. 451, 456–58 (S.D. Tex. 1995), as opposed to the sale of a business as a going concern, the seller retains the WARN Act notice requirement because the seller is the party actually closing the plant that results in employment losses for fifty or more employees. Smullin, 420 F.3d at 839–40. Because the plant in Smullin was sold as a going concern, the sale fell within § 2101(b)'s sale-of-business exclusion, so that any potential notice requirement fell on the buyer's shoulders, regardless of the seller's technical termination of its employees' employment that occurred by reason of the sale itself. Id. at 841. Because the seller did not owe a duty under the WARN Act and because the buyer did not take any action that violated the WARN Act, the Court held that neither the buyer nor the seller violated the WARN Act. Id.

There can be no doubt that employees are entitled to notice under the WARN Act when a qualified plant closing occurs. See 20 C.F.R. § 639.4(c) ("Affected employees are always entitled to notice; at all times the employer is responsible for providing notice."). The essential question is whether the seller or the buyer is

-8-

considered the employer for WARN Act purposes. When the sale of a business as a going concern is involved, the sale-of-business exclusion creates a presumption that the buyer is the employer for WARN Act purposes if the seller still employs its employees on the day of the sale. Unless something indicates otherwise, the sale of a business as a going concern typically will not involve a qualified plant closing with resultant employment loss unless and until the buyer makes such a decision.[3]

In this case, any potential WARN Act notification requirement belonged to ALLC, the buyer of API's business as a going concern. It is undisputed that API did not terminate its employees' employment until August 25, 2000, the date of the sale. We also deem it obvious that API did not close its Arkansas manufacturing plant before August 25. Indeed, API had every reason to believe that the sale of its business would not result in a plant closing, as defined by the WARN Act, because ALLC gave every indication that it was buying API as a going concern. For example, Mestek, Inc., ALLC's parent company, formed ALLC to purchase API, thus keeping the Airtherm name for continuity of operations. In May 2000, ALLC agreed in the Purchase Agreement to hire all of API's employees. Until the Amended Purchase Agreement was executed four days before the sale closed, API absolutely had no reason to believe the sale of its business would result in a plant closing affecting fifty or more employees. When the Amended Purchase Agreement changed the section

---

[3]This approach to applying the WARN Act's notice requirement should assist buyers and sellers of businesses in knowing who holds WARN Act responsibility. In implementing the WARN Act's sale-of-business exclusion, the Department of Labor provided practical advice to employers: "It may be prudent for the buyer and seller to determine the impacts of the sale on workers, and to arrange between them for advance notice to be given to affected employees or their representative(s), if a . . . plant closing is planned." 20 C.F.R. § 639.4(c)(2). Thus, both the seller and the buyer must be vigilant as to who bears the notification duty should one of them decide to close a plant. Indeed, the Department of Labor instructs buyers and sellers to work together to assure compliance with the WARN Act.

dealing with the hiring of all of API's employees, ALLC concomitantly promised API that ALLC would hire a substantial number of API's employees such that fewer than fifty employees would lose their jobs as a result of the sale of the business.

In the face of ALLC's assurances, why would API notify its employees of a plant closing? There is no good answer to that question. A simple reading of the WARN Act—with an eye toward its purpose—prescribes that no such notice was required. Indeed, if API had given WARN Act notice to its employees in the face of ALLC's assurances, one could imagine a situation in which no employee would remain by the time the closing date arrived. ALLC, as the buyer of API's business as a going concern, certainly would not be enthused by a vacant labor pool at the time of closing. Thus, the sale-of-business exclusion and our precedent dictate that ALLC became the employees' employer for WARN Act purposes once the sale of API's business became final. Any WARN Act notice responsibilities fell on ALLC, and not on API.

The District Court asked, "[D]oes the 'sale of business' exception apply in cases like this, where assets are sold but the employees are not immediately or actually transferred to the buyer as part of the sale?" Wilson, 2001 WL 34818807, at *3. This question misses the mark because "nothing in [the] WARN [Act] requires a seller to insist upon a contract term guaranteeing its employees continued employment with the buyer." Int'l Alliance of Theatrical & Stage Employees & Moving Picture Mach. Operators, AFL-CIO v. Compact Video Servs., Inc., 50 F.3d 1464, 1468 (9th Cir.), cert. denied, 516 U.S. 987 (1995). Similarly, it is presumed that a sale of a business as a going concern involves the hiring of the seller's employees unless something indicates otherwise. Focusing on whether the seller terminated its employees' employment is not the proper focus when analyzing potential WARN Act violations involving the sale of a business as a going concern. Instead, the WARN Act takes a "functional, common sense approach," Smullin, 420 F.3d at 839, attempting to

determine who actually effects the plant closing. An example might illustrate why the District Court's question lacked the proper focus. Assume that API terminated its employees' employment on the day of the sale of its business as a going concern without guaranteeing that its employees would gain employment with ALLC. But ALLC had assured API that ALLC would hire a substantial number of API's employees such that fewer than fifty employees would suffer an employment loss under the WARN Act. On the day after the sale, ALLC hired all of API's employees, including every employee that had been laid off by API over the past ten years. If we were to apply the District Court's and the plaintiffs' interpretation of the WARN Act, we would be required to hold API liable for failing to give WARN Act notice to its employees regardless of the fact that all of API's employees were hired by the buyer. The WARN Act does not compel such an absurd result. Without the benefit of Smullin, the District Court wrongly focused on API's technical termination of its employees' employment on the day of the sale rather than focusing on whether there was a sale of a business as a going concern and on what API and ALLC anticipated as to employee hiring.[4]

---

[4]To be certain, the record paints a picture that API and ALLC may have attempted to structure the sale of API in such a way as to avoid any successor labor responsibilities for ALLC. Regardless of the effects of this conduct in the labor relations arena, this appeal focuses on the WARN Act's sale-of-business exclusion. Thus, a decision to technically terminate employment or close a plant to achieve a desired effect on labor relations does not answer the questions of whether there is a plant closing for purposes of the WARN Act or who has notification responsibility if a plant closing occurs. See, e.g., Compact Video Servs., 50 F.3d at 1468.

III.

For the reasons stated, we reverse the grant of summary judgment to the plaintiffs and remand to the District Court to enter judgment in API's favor.[5]

_____

[5]The District Court "compliment[ed] the parties on the quality of work, the competent manner in which this case was tried and briefed, the collaboration of counsel in the production of 125 joint exhibits, as well as numerous stipulations; and, the agreement of the computations necessary for the various methods of calculations necessary depending on the fact findings and legal conclusions made that govern the remedy." Wilson v. Airtherm Prods., Inc., No. 2-01-CV-00055-WRW, slip op. at 4 (E.D. Ark. Sept. 29, 2004). We echo the District Court's compliments, repeating an important sentiment expressed by this Circuit a few years ago: "Civil law is not always practiced in a civil manner. We commend both attorneys in this difficult case for their professionalism. They skillfully litigated the contentious issues and zealously represented their clients without sacrificing civility, a linchpin of our legal system. . . . We applaud their devotion to the highest standards of the law." Cisar v. Home Depot U.S.A., Inc., 351 F.3d 800, 804 n.5 (8th Cir. 2003).