

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-1996

# Kalwaytis v. Preferred Meal Systems, Inc.

Precedential or Non-Precedential:

Docket 95-7191

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Kalwaytis v. Preferred Meal Systems, Inc." (1996). *1996 Decisions.* Paper 214.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/214

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-7191
_____


MARIE A. KALWAYTIS; PEGGY JACKSON; LYDIA T.
HREBEN; SHIRLEY MUSTICH,

<u>Appellees</u>

v.

PREFERRED MEAL SYSTEMS, INC.,

<u>Appellant</u>
_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. No. 93-cv-00371)
_____


Argued January 10, 1996

Before:  SCIRICA, ALITO, and WEIS, <u>Circuit</u> <u>Judges</u>.

Filed: March 11, 1996
_____

Elliot J. Mandel, Esquire (ARGUED)
Kaufman, Naness, Schneider & Rosensweig
390 North Broadway
Jericho, NY    11753

<u>Attorneys for Appellant</u>


James A. Diamond, Esquire (ARGUED)
Handler, Gerber, Johnston & Aronson
Suite 100, 150 Corporate Center Drive
Post Office Box 98
Camp Hill, Pennsylvania  17001-0098

<u>Attorney for Appellees</u>

_____

OPINION OF THE COURT

_____

WEIS, <u>Circuit</u> <u>Judge</u>.

In this WARN Act case, the principal issue is the amount of damages payable to employees who were on seasonal layoff at the time the employer announced what amounted to a permanent layoff. The workers received letters sent less than the 60 days required by the statute before the permanent layoff began. The district court awarded damages for 60 days, as if no notice had been sent. We conclude that the notice was untimely, and that the violation period began on either the day each employee reasonably expected to return to work after the seasonal break or the permanent layoff date set by the employer, whichever was earlier. Accordingly, we will remand for a recalculation of damages.

Plaintiffs are former employees of Preferred Meal Systems, Inc., which prepared pre-packaged meals for schools at a plant in Moosic, Pennsylvania. Because of the seasonal nature of its business, the company had a practice of laying off employees during schools' summer vacation months. In May and June 1992, eighty-five of Preferred's approximately 124 employees began their summer layoffs.

On June 26, 1992, the company sent a letter to the employees advising them that "[o]n August 1, 1992," it would be "ceasing direct food service employment" at the Moosic plant, and "laying off its food service employees." "This letter is your

notice of layoff as of August 1, 1992." Noting that this was "the normal time" when "seasonal lay-offs would occur," the letter explained that in the future, Preferred would "contract with Culi-Services, Inc. to provide food service employees at this location." The letter continued, "Culi-Services, Inc. has an immediate offer of employment to make to you. If you are interested . . . you must contact them directly."

On the same day, Culi sent a communication to the Preferred employees informing them that it would be "recruiting" for certain positions. Culi also placed ads in the local newspapers seeking applicants for the jobs. Culi's announced wages were lower than those Preferred had paid for the same work.

In a letter dated July 10, 1992, Preferred wrote again to its employees, stating:

> "The June 26 letter may have incorrectly conveyed the impression that Culi-Services, the new employer, has an offer of employment to make to you. We are sorry for any confusion this letter may have created, but Culi-Services does not have an offer of employment for you at this time. Any offer of employment will depend upon your application and Culi Services discretionary judgement as to the best applicants available for the limited number of positions available."

Preferred ultimately retained a small number of its employees and Culi hired some, but not all, of the remainder.

Plaintiffs, consisting of a class of sixty-nine former Preferred employees, filed a complaint against the company, asserting a failure to give them 60 days notice of the mass layoff as required by the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. §§ 2101-2109. Preferred defended on the basis that it was a "joint employer" with Culi. Preferred also contended that the time between the seasonal layoff in May and the sub-contracting with Culi in late June 1992 should not be considered as a WARN Act violation period.

Finding that the size of the work force at Moosic and the number of employees affected brought the matter within the scope of the WARN Act, the district court granted summary judgment to the plaintiffs and awarded damages in the amount of $253,337.43. The court rejected Preferred's joint employer defense, observing that the WARN Act did "not define the term `employer' to encompass separate business entities which enjoy a simple contractual relationship to produce the goods previously produced by one of the entities." The court also held that the plaintiffs' expectations of returning to employment with Preferred were destroyed on June 26, 1992, when the temporary layoff became permanent. Accordingly, because they had not received a notice 60 days before that date, the plaintiffs were entitled to 60 days wages.

Preferred has appealed, reiterating its joint employer contention and also asserting that the damages should be

4

recalculated because the plaintiffs would have been unemployed in any event during the summer season.

I.

Preferred's joint employer defense is based on the proposition that if the number of employees who took positions with Culi is taken into account, the threshold number of employees required to bring the WARN Act into play, 29 U.S.C. § 2101(a)(2), is not met. As Preferred sees it, if it and Culi are considered as a single enterprise, when eighty-five employees were laid off and fifty-four were re-employed by Culi, less than the statutory minimum of fifty employees were adversely affected. See 29 U.S.C. § 2101(a)(6).

Preferred's only evidence that a joint employment relationship existed is that a union, attempting to secure an election at the Moosic plant, contended in a July 1993 letter to the National Labor Relations Board that Preferred was a joint employer with Culi. Apparently, that case has not been resolved and its res judicata effect, if any, is not before us. Nor need we consider whether there is a distinction between the policies established by the National Labor Relations Act, with respect to various employer alignments, and situations arising under the WARN Act. See United Steelworkers of America v. Crown Cork & Seal Co., 32 F.3d 53, 59 (3d Cir. 1994), aff'd 115 S. Ct. 1927 (1995) (noting "vast" policy differences). The union's bare contention is simply not an adequate basis for a finding on the issue in the case before us.

5

Similarly, because of the lack of any factual development, we need not explore the analogies that Preferred relies upon in its citation of <u>Headrick v. Rockwell Int'l Corp.</u>, 24 F.3d 1272 (10th Cir. 1994) and <u>International Alliance of Theatrical and Stage Employees v. Compact Video Services, Inc.</u>, 50 F.3d 1464 (9th Cir. 1995). Those cases discussed the sales of businesses and the continuation of employment.

In the summary judgment context here, Preferred had the burden of producing evidence to support its claim of joint employment. It did not do so, and consequently, the district court did not err in rejecting that defense.

## II.

The second issue raised by Preferred is the damages assessment. Although not sharply delineated by the parties, we see the point in dispute to be the district court's determination that the employment relationship ended on June 26, 1992, when the first letter was sent, and that 60 days pay was due beginning on that day. Preferred contends that the layoffs beginning in May and early June were customary and anticipated by the affected workers. Consequently, the argument goes, when they left for the summer, the employees had no expectation of working until the autumn, and calculation of WARN damages should take into account the customary recall date in late August or early September.

29 U.S.C. § 2102(a) provides:

"An employer shall not order a plant closing or mass layoff until the end of a 60-day

6

> period after the employer serves written
> notice of such an order --
> . . . to each affected employee . . . and to
> the State dislocated worker unit . . . and
> [to] the chief elected official of the unit
> of local government within which such closing
> or layoff is to occur."

An employer failing to notify the governmental units is subject to a civil penalty. 29 U.S.C. § 2104(a)(3). Preferred did not file a report with the appropriate governmental units, but no claims for the civil penalties are presented here. Moreover, they are severable from those asserted by the employees. We will therefore not consider the civil penalties further.

Section 2104(a)(1) provides that an employer who orders a "mass layoff" in violation of the notice provision is "liable to each aggrieved employee who suffers an employment loss" as the result of such layoff for "back pay for each day of violation" and for employee benefits as well. In United Steelworkers of America v. North Star Steel Co., 5 F.3d 39, 43 (3d Cir. 1993), we concluded that "WARN uses the term `back pay' simply as a label to describe the daily rate of damages payable." Hence, that case establishes the upper limit of damages applicable here as 60 calendar days wages. Contra Frymire v. Ampex Corp., 61 F.3d 757, 771-72 (10th Cir. 1995) (damages calculated on number of working days lost during the violation period); Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1286 (5th Cir. 1994)

7

(same).  Because the termination date of employment was not pertinent in <u>North Star Steel</u>, we did not address the point and that case does not control the resolution of the issue here.

The statute defines "mass layoff" as a reduction in force which "results in an employment loss."  29 U.S.C. §2101(a)(3)(B).  "Affected employees" are those "who may reasonably be expected to experience an employment loss as a consequence of a proposed . . . mass layoff."  29 U.S.C. §2101(a)(5).  Thus, an employer is liable when it fails to give notice of a mass layoff that may be expected to cause a work loss to employees.

Also pertinent to this case is 29 U.S.C. § 2102(c), which states:  "A layoff of more than 6 months which, at its outset, was announced to be a layoff of 6 months or less shall be treated as an employment loss . . . " unless the extension is caused by unforeseeable business circumstances and notice is given when it becomes reasonably foreseeable that the layoff will extend beyond six months.'

---

'The district court rejected Preferred's assertions that the layoff extension was not foreseeable.  We find no basis to disturb that ruling on this record.  29 U.S.C. § 2102(c) establishes a basis for finding liability on the part of Preferred, but it provides no guidance on the date the employment loss began or on the measure of damages as discussed in Parts A and C, <u>infra</u>.

8

A. When Did Employees Suffer a "Work Loss?"

It appears that as of June 25, 1992 (the day before the first letter), the employees, who were then in the usual summer status, had no reasonable expectation of working for Preferred until the end of the seasonal layoff in the fall of 1992. The summer shutdown in prior years did not cause compensable work losses under the WARN Act. It was the conversion of the seasonal layoff into a permanent one that constituted the triggering event, which required Preferred to give notice.

The difference between the situation in 1992 and that of former years was that the workers would not be returning to their regular jobs at the usual time, but instead would be on indefinite layoff as of August 1, 1992. At that point, further employment was no longer available, just as in the more common situation when persons steadily employed throughout the year are removed from a company's payroll on a specified date.

The letter of June 26, 1992 stated that the layoff was effective on August 1, 1992. This is inconsistent with Preferred's argument, which instead would have us look to the date in September when the seasonal layoffs usually ended. We believe that Preferred should be held to the terms in its letter. Moreover, Preferred treated the workers as "former employees" as of August 1, 1992 in connection with termination of benefits coverage, including health insurance.

The starting point of the violation period, therefore, should be August 1, 1992 (the day specified in the employer's

notice) unless based on Preferred's previous recall practice, an employee reasonably expected to be recalled before that date.

### B.    When Was Notice Given?

We must also consider whether the letters sent by Preferred qualified as notice under the WARN Act.  Pursuant to statutory direction, see 29 U.S.C. § 2107, the Secretary of Labor promulgated regulations governing the content of the notice.  The regulations do not specify the use of a special form, but they do require that certain information be included in understandable language.  The notice should tell the employees whether the planned action is to be permanent or temporary; the expected date when the layoff will begin; when the individual employees will be separated; when bumping rights exist; and the name and telephone number of a company official who may be contacted.  20 C.F.R. § 639.7(d).

Flexibility in the notice requirement, however, is recognized by the provision that the notice is to be based on the best information available to the employer at the time the notice is served.  "It is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that [ ] minor, inadvertent errors are to be the basis for finding a violation of WARN."  20 C.F.R. §639.7(a)(4).

Fairly read, the regulations require a practical and realistic appraisal of the information given to affected employees.  We therefore examine the correspondence sent to the

employees to determine if it provided adequate notification of the mass layoffs.

The recipients of Preferred's letters could reasonably assume that they would suffer an employment loss. The June 26, 1992 letter, however, was ambiguous about the employees' future prospects with Culi. Preferred recognized this problem and clarified the lack of guaranteed employment with Culi in its letter of July 10, 1992.

Giving a reasonably pragmatic interpretation of the two letters, we conclude that, read together, they do meet the statutory requirements of notice. However, because the ambiguity in the first letter was not resolved until July 10, 1992, that later date should be the effective date of the notice.

C.   Damages Calculation

In Dillard Dep't Stores, the Court of Appeals said "[t]he violation period is comprised only of those `days after the shutdown or layoff in violation of [the WARN Act] and extends for the number of days that notice was required but not given.'" 15 F.3d at 1286 (citing H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 1052 (1988), reprinted in 1988 U.S.C.C.A.N. 2078, 2085). Further, the Court commented that if an employee was actually terminated within the 60 day notice period "such that the employee actually received less than the full sixty days notice, then the violation period would range from the actual date of termination until the end of the sixty-day notice period." Id. at 1286-87.

We agree with the reasoning of the Dillard court. It is the date when the employment loss could be expected to occur that marks the starting point, not the date on which the employee learns that a loss will occur in the future. Ordinarily, the starting point will be the end of the seasonal layoff, but here, Preferred set the date by stating in its letter that the work loss would commence on August 1st.[2] Preferred's notice period began on July 10, 1992 and the 60 calendar days needed to avert a violation would extend to September 8, 1992. Because the indefinite layoff began on August 1, the employees therefore would be entitled to damages for thirty-nine calendar days (August 1 to September 8). If, however, any employee reasonably expected his or her seasonal recall to end before August 1, additional damages would be due so as to account for the full 60 days period. For example, a worker whose seasonal layoff would have ended on July 29 would be entitled to forty-one days.

This method of calculation is consistent with the purpose Congress had in mind when it enacted the WARN Act. The regulations capture the spirit of the legislation in stating that the 60 day notice "provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs" or to obtain training for further employment. See 20 C.F.R. § 639.1.

---

[2]Because of the timing of Preferred's notice, employees may receive what might, in other circumstances, be regarded to some extent as a "windfall" by obtaining wages for days they otherwise would have been on seasonal layoff. As we noted earlier, however, Preferred selected the date as August 1 and employee benefits were phased out as of that date.

By using the formula adopted here, employees who were not actually working when the layoff extension was imposed receive the same amount of time to seek employment and make the necessary adjustments as workers who were on the job at the time the indefinite layoff was imposed. In the only published opinion in which an analogous situation was presented, a district court came to a similar conclusion. <u>See</u> <u>Marques v. Telles Ranch, Inc.</u>, 867 F. Supp. 1438 (N.D. Cal. 1994).

Accordingly, the order of the district court holding Preferred liable under the WARN Act will be affirmed. The case will be remanded to the district court for recalculation of the damages due under the Act in accordance with this Opinion.

_____