131 F.3d 1331
 13 IER Cases 975, 97 Cal. Daily Op. Serv. 9697,
97 Daily Journal D.A.R. 15,583
 Eloy MARQUES; Ernesto Yzquierdo; Noel Yzquierdo; Jose
Juan Gonzalez, Plaintiffs-Appellants and Cross-Appellees,
v.
TELLES RANCH, INC.; Mayfair Farms; Telles Farms; Frank R.
Telles; Mona Jo Telles; Sharon Telles Wegis; Melissa
Telles Brozek; Frances Telles; Mary Fortney; Billy
Zimmerman; Richard C. Telles; Philip Thompson; William A.
Jones, Defendants-Appellees and Cross-Appellants.
 Nos. 95-16402, 95-16696.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1996.
Decided Dec. 29, 1997.
 
 Richard S. Kohn, The Mills Firm, Greenbrae, California (Stephen A. Rosenbaum, Michael Meuter, Mary K. Gillespie and William G. Hoerger, Law Offices of California Rural Legal Assistance, on the briefs), for plaintiffs-appellants and cross-appellees.
 Barry E. Rosenberg, Klein, Wegis, DeNatale, Goldner & Muir, Bakersfield, California, for defendants-appellees and cross-appellants.
 Appeal from the United States District Court for the Northern District of California; James Ware, District Judge, Presiding. D.C. No. CV-93-20187-JW.
 Before: FLETCHER, FARRIS and TASHIMA, Circuit Judges.
 TASHIMA, Circuit Judge:
 
 
 1
 Plaintiffs, seasonal and year-round lettuce harvesters, who were formerly employed by Telles Ranch, Inc. ("TRI"), brought this action against TRI under the Worker Adjustment and Retraining Notification Act ("WARN"). 29 U.S.C. §§ 2101-2109. They each received a letter on November 29, 1991, informing them that TRI was discontinuing its lettuce harvesting operations. The subclass of seasonal employees, who normally would have been on an off-season layoff from November to April, claim that they suffered an employment loss in November, 1991, when they received the letter. They contend that TRI did not provide them with the 60-day notice that WARN requires before a loss of employment resulting from a plant closing or mass layoff.
 
 
 2
 Plaintiff employees filed this as a class action under WARN. The district court certified the action as a class action.[1] It later, at plaintiffs' request, certified two subclasses within that class:
 
 
 3
 There are two subclasses of employees: (1) Seasonal employees, represented by ELOY MARQUES, ERNESTO YZQUIERDO AND NOEL YZQUIERDO; (2) Non-seasonal employees, represented by JOSE JUAN GONZALEZ.
 
 
 4
 The district court granted partial summary judgment in favor of TRI, finding that the subclass of seasonal employees suffered an employment loss in April, 1992, when TRI failed to plant the crop for the next season's harvest; therefore, that they received sufficient notice by the November letter. Marques v. Telles Ranch, Inc., 867 F.Supp. 1438, 1445 (N.D.Cal.1994).
 
 
 5
 The primary issue presented by this appeal is whether the seasonal employees suffered an employment loss in November, just after the beginning of their seasonal layoff, or in April, when they normally would have reported back to work for the next harvest season. Because we hold that the seasonal workers suffered an employment loss in April, at the earliest time they reasonably could have expected to be recalled to work, we affirm the judgment of the district court.
 
 I. Facts
 
 6
 Prior to 1991, TRI harvested lettuce year round. The April through November harvest took place in the vicinity of Salinas and Huron, California (the "northern area"). The December through March harvest took place in Arizona, near Tacna and Yuma (the "southern area"). Some class members were employed year-round and worked for TRI at both sites; others worked only in the northern area from April through November.
 
 
 7
 At the end of the previous harvest seasons, the seasonal employees received a form entitled "Employment, Change and Termination," with a box checked "layoff" and a date when they were to call in to determine when to report for the following season.[2]
 
 
 8
 In April 1991, TRI contracted harvesting responsibilities for the southern area to another company. In addition, sometime prior to the end of the 1991 northern area season, TRI decided that it would cease its lettuce harvesting operations entirely, and contracted with another company to do its lettuce harvesting in the northern area for the 1992 season.
 
 
 9
 All of the northern area seasonal employees received their regular layoff notices on November 27, 1991, at the termination of the 1991 season. However, on November 29, 1991, TRI notified all plaintiff class members of the permanent termination of its lettuce harvesting operations. The notice read:
 
 
 10
 NOTICE TO ALL LETTUCE HARVESTING CREWS OF TELLES RANCH, INC.
 
 
 11
 We regret to inform you that due to circumstances out of our control, the company will discontinue all of its lettuce harvesting operations. The company appreciates all (your) the work done for it and wishes you the best in the future. In the event that the company in the future would re-open its own lettuce harvesting crews, you will be given first consideration in our proceeding [sic] of employment. If you wish to continue your health insurance, you will need to pay your whole premium amount effective January 1, 1992. Only the employees presently employed will be eligible for the health insurance. Thank you and we wish you the best.
 
 
 12
 TELLES RANCH, INC. November 29, 1991.
 
 II. Discussion
 
 13
 The seasonal workers appeal from the grant of summary judgment to TRI.[3] We review a grant of summary judgment de novo. King v. AC & R Advertising, 65 F.3d 764, 767 (9th Cir.1995). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 
 14
 The purpose of WARN is to ensure that workers receive advance notice of plant closures and mass layoffs that affect their jobs. Alarcon v. Keller Indus., Inc., 27 F.3d 386, 388 (9th Cir.1994) (citing 20 C.F.R. § 639.1(a) (1993)). Therefore, the Act requires, with some exceptions, that a covered employer give affected workers 60 days' written notice of a plant closing or mass layoff. Id. (citing 29 U.S.C. § 2102(a)).
 
 
 15
 WARN defines a "plant closing" as: (1) the permanent or temporary shutdown of a single site of employment, (2) if the shutdown results in an employment loss at the single site of employment during any 30-day period, (3) for 50 or more employees, excluding any part-time employees. 29 U.S.C. § 2101(a)(2).
 
 
 16
 In turn, "employment loss" is defined as: (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement; (b) a layoff exceeding six months; or (c) a reduction in work hours of more than 50 percent during each month of any six-month period. 29 U.S.C. § 2101(a)(6).[4]
 
 
 17
 It is uncontested that the seasonal workers here suffered an employment loss, and that the statutory definition of a plant closing was met. The parties' disagreement relates to the time at which the seasonal workers should be deemed to have suffered their employment loss.[5] The seasonal workers argue that they suffered an employment loss at the time they were notified in November that they would not be recalled to work in April. On the other hand, TRI contends the workers suffered an employment loss in April, at the time they would have been recalled. In support of their contention, the seasonal workers point to the fact that it was in November when they were no longer considered "employees" of TRI and lost their expectation of being recalled to work in April. They note that it was in November that TRI ceased its harvesting operations.
 
 
 18
 We reject the argument advanced by the seasonal workers because they have not specified what they "lost" in November, beyond the expectation of being recalled to work in April. They have not identified any tangible benefit they otherwise would have enjoyed, as a result of their relationship with TRI, during the 60 days following the termination notice in November. Loss of the expectation of recall cannot be considered an immediate "employment loss." Otherwise, a year-round employee, who is given the required 60-day notice, would also suffer an "employment loss" at the time he or she is given notice because he or she would then lose his or her expectation of being employed beyond the 60-day period.
 
 
 19
 With some exceptions, WARN simply does not protect workers' employment expectations beyond 60 days into the future. In short, the seasonal employees stood, during the 60-day period following notification in November, in the same posture with respect to TRI as in any other ordinary off-season. The employment relationship was not any more severed on November 29, 1991, than it was in prior years at the time of the customary November layoff.
 
 
 20
 The only tangible and cognizable loss the seasonal workers experienced occurred in April, when the workers reasonably could have expected to be recalled to work. Up until that point, the seasonal workers had not lost anything in connection with their employment, except their expectation of returning to work in April, a factor we have found not to be sufficient to cause an immediate "employment loss." It was in April that the seasonal workers would again earn wages and benefits. During an ordinary off-season, TRI did not owe any obligation to seasonal workers beyond the expectation of recall at the beginning of the next season.[6] Therefore, the one factor on which the seasonal workers have relied is insufficient to sustain a finding of a WARN "employment loss" in November.
 
 
 21
 Our conclusion is consistent with the approach adopted recently by the Third Circuit in a similar case. Kalwaytis v. Preferred Meal Sys., Inc., 78 F.3d 117 (3rd Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 73, 136 L.Ed.2d 32 (1996). Under Kalwaytis, the date of an "employment loss" corresponds to the time when the seasonal workers expect to return to work, unless the employer has chosen an earlier date on which to make the termination effective, in which case the employment loss occurs on that earlier date. Id. at 121. In Kalwaytis, the employer chose a date certain prior to the beginning of the next season, after which the seasonal workers were treated as " 'former employees' ... in connection with termination of benefits coverage, including health insurance." Id. The conclusion we reach today is consistent with Kalwaytis because, unlike the workers in that case, the seasonal workers here have not pointed to any employment benefit they would have received during the off-season had they not been notified in November that TRI would be ceasing its harvesting operations.
 
 
 22
 Alternatively, the seasonal workers contend that they suffered an employment loss in November because their termination had the effect of extending their ordinary seasonal layoff indefinitely. Accordingly, they argue that they suffered a layoff of more than six months, and that, under 29 U.S.C. § 2102(c) and 20 C.F.R. § 639.4(b), such a layoff results in an "employment loss" on its first day, even if the layoff is announced, at its outset, to be one of less than six months. See generally, Washington v. Aircap Indus. Corp., 831 F.Supp. 1292, 1299 (D.S.C.1993). We reject this argument because it is based on a statutory provision which, by its terms, applies only to layoffs, as opposed to terminations. The seasonal workers here were terminated on November 29, not laid off for an unanticipated additional period of time; therefore, § 2102(c) does not apply. WARN makes a clear distinction between terminations and layoffs. We assume Congress intended that distinction to have some meaning, and no reason has been advanced why that distinction should be ignored. We, thus, decline to apply WARN's layoff provisions to a termination.
 
 
 23
 Finally, our holding is consistent with the purposes behind WARN. The 60-day notice period required by WARN is designed to give workers time to adjust to their prospective loss of employment, to seek and obtain alternative jobs, and, where necessary and available, to seek retraining to allow successful competition in the job market. Alarcon, 27 F.3d at 388 (citing 20 C.F.R. § 639.1(a)(1993)). These purposes of WARN are fully served by construing the notice in this case as timely. Here, adequate notice was given and the employees had adequate opportunity to find employment elsewhere. Construing TRI's notice as timely still affords the plaintiff workers more than the 60 days contemplated by the Act, before the start of the new harvesting season, in April 1992, to adjust to the shutdown of TRI's lettuce harvesting operations. A contrary conclusion would give the seasonal workers a 60-day windfall of pay, during a period when they ordinarily would be on unpaid layoff, without furthering the statute's purpose.
 
 
 24
 The plaintiff employees also contend that TRI's failure to give timely notice to both the appropriate unit of local government and the state dislocated worker unit, as required by 29 U.S.C. § 2102(a)(2), gives rise to an independent claim for damages. WARN, on its face, does not provide a private right of action to enforce its local government notice requirement. The only remedy expressly provided by the Act for a violation of this provision is a civil penalty of not more than $500 "for each day of such violation...." 29 U.S.C. § 2104(a)(3).
 
 
 25
 Under the Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), analysis, "[t]he most important inquiry ... is whether Congress intended to create the private remedy sought by the plaintiffs." Suter v. Artist M., 503 U.S. 347, 364, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992)(citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16, 100 S.Ct. 242, 244-45, 62 L.Ed.2d 146 (1979)). Here, it is unnecessary to go beyond the text of the statute itself to discern Congress' clear intent.
 
 
 26
 First, WARN expressly creates a private right of action for an employee who is adversely affected by a plant closing. 29 U.S.C. § 2104(a)(1). However, this private right of action for back pay is expressly limited to "aggrieved employees," who are defined as only those employees who "did not receive timely notice...." 29 U.S.C. § 2104(a)(7). Finally, Congress has expressly spoken on the subject: "The remedies provided for in this section shall be the exclusive remedies for any violation of this chapter." 29 U.S.C. § 2104(b) (emphasis added). We conclude that WARN does not provide a private right of action to enforce its requirement under § 2102(a)(2) that notice of a plant closing or mass layoff be given to state and local government.
 
 
 27
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 On September 27, 1993, it certified the following class:
 All persons who were employees of the defendant in the Salinas based lettuce harvesting operation who (1) meet the definition of "affected employees" in 29 U.S.C. § 2101(a)(5); (2) experienced a termination, layoff or any other employment loss within the definition of 29 U.S.C. § 2101(a)(6) as a consequence of the plant closing or mass layoff on or before November 29, 1991, by the defendant or at defendant's Salinas based lettuce harvesting operation; and (3) who did not receive written notice of his or her termination of employment at least sixty (60) days prior to such termination.
 
 
 [2]
 During the northern area off-season, which extended from December through March, many class members collected unemployment insurance benefits
 
 
 [3]
 The district court subsequently granted summary judgment to TRI on the claims asserted by the remainder of the class, i.e., the subclass consisting of TRI's non-seasonal employees. The issues raised by that subclass, as well as other issues raised by the seasonal employee subclass and on the cross-appeal, are addressed in an unpublished Memorandum disposition filed concurrently with this Opinion
 
 
 [4]
 A layoff of more than six months, which at its outset was announced to be a layoff of six months or less, is also treated as an employment loss unless unforeseen business changes forced the extension and notice is given at the time it becomes reasonably foreseeable that the extension beyond six months will be required. 29 U.S.C. § 2102(c)
 
 
 [5]
 WARN does not explicitly address the temporal relationship between a plant closing and an employment loss in the context of seasonal workers. Nothing in WARN requires that both events occur at the same time
 
 
 [6]
 Nothing in the record indicates that this obligation was "owed" in any legal sense, i.e., it is doubtful that this expectation of recall was a vested right