Gerard J. SCHMELZER, Petitioner,

v.

OFFICE OF COMPLIANCE, Respondent,

and

Office of the Chief Administrative Officer of the United States House of Representatives, Respondent.

No. 98–6001.

United States Court of Appeals, Federal Circuit.

Sept. 17, 1998.

---

Daniel J. Tobin, Kirkpatrick & Lockhart LLP, Washington, DC, argued for petitioner.

Gary Green, General Counsel, Office of Compliance, of Washington, DC, argued for respondent, Office of Compliance. Of counsel was Mary Masulla, Attorney, Office of General Counsel.

Michael L. Stern, Senior Counsel, Office General Counsel, U.S. House of Representatives, Washington, DC, argued for respondent, Office of Chief Administrative Officer.

Before RADER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Gerard J. Schmelzer petitions for review of a decision ·of the Board of Directors· of the Office of Compliance (Board), which held that he was not entitled to relief for an alleged violation of section 205 of the Congressional Accountability Act of 1995(CAA), 2 U.S.C. § 1315. Because we agree with the Board that Mr. Schmelzer was not denied any rights granted to him under the pertinent statutory and regulatory provisions, we affirm.

I

Mr. Schmelzer was employed by House Postal Operations (HPO), a division of the Office of the Chief Administrative Officer (CAO) of the United States House of Representatives. In early 1995, the Committee on House Oversight decided to privatize HPO's mail delivery functions. On June 14, 1995, all HPO employees received a memorandum advising them of the privatization plans. The memorandum stated that upon award of the contract, "the selected vendor will be required to interview all interested current employees." Mr. Schmelzer testified that, after reading the June 14 memorandum, he understood that he would be interviewed for a position with the private contractor, but that he and other HPO employees believed that "they [were] getting rid of us ... to save money and to take away jobs and benefits."

On September 8, 1995, another memorandum was sent to all HPO employees informing them of the status of the plans to "outsource Postal Operations." The September 8 memorandum explained that final bids for outsourcing HPO's functions were due by September 15, 1995, and that the winning bidder "is scheduled to begin operations in mid-December." The memorandum also explained that the winning bidder would interview all interested HPO employees for possible employment and that employees with questions should contact Ben Lusby, the author of the memorandum. Although Mr. Schmelzer testified that he did not recall receiving the September 8 memorandum, he does not challenge the Board's factual finding that the memorandum was provided to all HPO employees.

On December 13, 1995, the Committee adopted a resolution directing that HPO

functions be terminated as of February 13, 1996, and authorizing the award of a contract to Pitney Bowes Management Services to take over the HPO functions. The resolution instructed the CAO to facilitate an "orderly transition" of operations to the new contractor and to ensure that all existing HPO employees were given an opportunity to apply for employment with Pitney Bowes. The resolution also directed the CAO to "immediately provide sixty days notice to existing House employees affected by the issuance of the contract." The resolution was posted on a bulletin board at the main HPO facility.

Although Mr. Schmelzer contends that he did not see the Committee resolution, he concedes that he attended a meeting held on December 13, 1995, for all HPO employees. During the meeting, a memorandum written by Kay E. Ford, Associate Director of Human Resources, was distributed to all attendees. That memorandum, which Mr. Schmelzer received, states in relevant part:

> The selection of Pitney Bowes Management Services has subsequently been approved by the Committee on House Oversight. As a condition of the selection process, the vendor has agreed to interview all current Postal Operations employees interested in employment with their organization. . . . The vendor will inform you directly if you are selected for a position in their organization. . . . The Human Resources' [sic] Office of Training, extension 60526, room 219, FHOB, and the Outplacement Resources Center, extension 64068, rooms 170–171, FHOB, are prepared to offer advice and assist with the preparation of applications on an appointment basis. To make the transition from employment with the U.S. House of Representatives as smooth as possible, an array of support, resources and information will be made available to you. This will include employee assistance programs designed to address the personal, professional and family concerns associated with the transition process as well as employee benefits consultations and briefings.

At the December 13 meeting, the HPO employees were informed that applications for employment with Pitney Bowes would be distributed the next day and that Pitney Bowes was expected to start operations on February 14, 1996. On December 14, Pitney Bowes representatives met with the HPO employees and distributed job applications. The employees at the December 14 meeting were again notified that February 14, 1996, was the "target date" for Pitney Bowes to begin operations. Mr. Schmelzer attended the December 14 meeting and received an application for employment with Pitney Bowes.

On December 19, 1995, Mr. Schmelzer submitted his application for employment with Pitney Bowes. On that application, he identified February 13, 1996, as the date he would be available to begin work. Mr. Schmelzer concedes that the February 13 date was a typographical error and that he intended to specify February 14 as the starting date. Pitney Bowes interviewed many of the HPO employees and offered jobs to 90 of the 110 HPO employees whose positions were to be terminated by CAO. Mr. Schmelzer, however, was not offered a job with Pitney Bowes. Thereafter, on January 23, 1996, Mr. Schmelzer received a termination letter stating that his employment with HPO would end on February 13, 1996.

Mr. Schmelzer acknowledges that the letter he received on January 23, 1996, satisfied the notice requirements of the applicable statute and regulations, except that it was not sent at least 60 days before his termination date. Following his termination, he filed a complaint with the Office of Compliance, contending that he was not provided with 60 days' written notice of his termination, as is required by section 205 of the CAA. *See* 2 U.S.C. § 1315(a)(1).

Following an evidentiary hearing, a hearing officer in the Office of Compliance denied Mr. Schmelzer's request for relief. Mr. Schmelzer appealed to the Board of Directors of the Office of Compliance, which affirmed the decision on the ground that the

notice he received on December 13, 1995, substantially complied with the Board's applicable regulations. Mr. Schmelzer petitions for review by this court pursuant to 2 U.S.C. § 1407(a).

## II

The CAA makes certain labor and employment laws applicable to the legislative branch of the government. The Worker Adjustment and Retraining Notification Act of 1988 (WARN Act), codified at 29 U.S.C. §§ 2101–2109, is one of the laws that Congress has imposed upon itself. *See* 2 U.S.C. § 1302(a)(9). Under section 205 of the CAA, which adopts the WARN Act, no employing office may be closed or mass layoff ordered "until the end of a 60–day period after the employing office serves written notice of such prospective closing or layoff to representatives of covered employees or, if there are no representatives, to covered employees." 2 U.S.C. § 1315(a)(1).

Although neither the CAA nor the WARN Act specifies what the written notice must contain in order to comply with the statute, the CAA requires the Board of Directors to issue implementing regulations, with the caveat that all regulations "shall be the same as substantive regulations promulgated by the Secretary of Labor ... except insofar as the Board may determine, for good cause ... that a modification of such regulations would be more effective for the implementation of the rights and protections under this section." 2 U.S.C. § 1315(c). In accordance with that statutory directive, the Board issued interim regulations. *See* 142 Cong. Rec. S270, S274 (daily ed. Jan. 22, 1996). Section 639.7(d) of those regulations, which is identical in all pertinent respects to section 639.7(d) of the Department of Labor WARN Act regulations, *see* 20 C.F.R. § 639.7(d), requires that the written notice to individual employees contain four elements:

(1) a statement as to whether the planned action is expected to be permanent or temporary and, if the entire office is to be closed, a statement to that effect;

(2) the expected date when the office closing or mass layoff will commence and the expected date when the individual employee will be separated;

(3) an indication whether or not bumping rights exist; and

(4) the name and telephone number of an employing office official to contact for further information.

## III

Mr. Schmelzer contends that the written notice he received on December 13, 1995, did not comply with any of the four requirements of the regulations—it did not specify that his job would be terminated, it did not provide the date of his termination, it did not specify whether bumping rights existed, and it did not supply the telephone number of an employing official. He concedes that the absence of reference to bumping rights and the omission of the telephone number of the employing official were minor omissions that do not give rise to liability, but he contends that the other two omissions rendered the notice fatally defective. Those defects, Mr. Schmelzer argues, require that he be awarded compensation for the failure to provide him with a fully compliant WARN Act notice until he was given his formal termination letter on January 23, 1996.

The CAO makes the threshold argument that because the CAA did not become effective until January 23, 1996, *see* 2 U.S.C. § 1315(d)(1), the CAO was under no obligation to give the statutorily required notice prior to that date. The hearing officer ruled that the 60–day notice requirement applied to all terminations occurring after the statute became effective, and that the 60–day requirement therefore applied in this case. The Board, however, found it unnecessary to reach that issue in light of its ruling that the December 13, 1995, notice substantially complied with the statutory and regulatory requirements. Because we agree with the Board on the merits, we too find it unnecessary to decide whether the 60–day notice

requirement applies to a termination that occurred less than 60 days after the CAA became effective. For the same reason, we also find it unnecessary to address the CAO's argument that because many of the HPO employees were offered positions with Pitney Bowes, the closing of the HPO did not constitute a "clos[ing]" of an office or a "mass layoff" requiring notice under section 205 of the CAA.

The CAO further contends that even if the statute required written notice 60 days prior to the closing of the HPO, the Board's interim regulations did not become effective until January 23, 1996, and that the CAO cannot be held accountable for a violation of regulations that were not yet in effect. The CAA provides, however, that "if the Board has not issued a regulation on a matter for which this chapter requires a regulation to be issued, the hearing officer, Board, or court, as the case may be, shall apply, to the extent necessary and appropriate, the most relevant substantive executive agency regulation promulgated to implement the statutory provision at issue in the proceeding." 2 U.S.C. § 1411. The most relevant executive agency regulation is the corresponding Department of Labor regulation, 20 C.F.R. § 639.7, which is identical in all material respects to the Board's interim regulation. Accordingly, even though the Board's interim regulations did not take effect until shortly before Mr. Schmelzer's termination, the same regulatory language was applicable to the CAO throughout the pre-termination period.

█ On the merits, Mr. Schmelzer first contends that the December 13, 1995, notice failed to state that the HPO office was to be permanently closed. While it is true that the notice did not contain the word "permanent," we agree with the hearing officer and the Board that the December 13 notice made it amply clear that the closing was not expected to be temporary and that employment with Pitney Bowes was not assured. The notice stated that the functions previously performed by HPO employees would be taken over by Pitney Bowes, and that Pitney Bowes would "interview all current Postal

Operations employees interested in employment with their organization" and would inform them directly if they were "selected for a position in that organization." The notice further stated that an array of support services, resources, and information would be made available to employees "to make the transition from employment with the U.S. House of Representatives as smooth as possible." We therefore agree with the Board that the December 13 notice satisfied the regulatory requirement of a "statement as to whether the planned action is expected to be permanent or temporary." 20 C.F.R. § 639.7(d)(1).

█ The more difficult question is whether the CAO adequately complied with the regulatory requirement to provide 60 days' notice of the date on which Mr. Schmelzer's employment with HPO was expected to end. In analyzing Mr. Schmelzer's claim, the Board applied a "substantial compliance" standard. It concluded that although the December 13, 1995, notice failed to state Mr. Schmelzer's expected termination date, that missing information was otherwise provided to Mr. Schmelzer more than 60 days before his termination, and that he knew that February 14, 1996, was the date that HPO functions would be turned over to Pitney Bowes.

We agree with the Board that "strict compliance" with the applicable regulations was not required by the statute, the regulations, or the pertinent case law. Neither the CAA nor the WARN Act specifies what must be contained in the 60-day notice, as long as the notice is in writing and is provided at least 60 days before termination. Both the Board's interim regulations and the Department of Labor's regulations require the expected termination date to be included in the 60-day notice, but they also state, in section 639.7(a)(4), that "minor, inadvertent errors" in the notice should not be considered a violation. The Labor Department's notice of proposed rulemaking stated that "in the early days of WARN implementation substantial compliance with the regulatory requirements should be sufficient to comply with WARN."

53 Fed.Reg. 49076, 49077 (1988). In its notice of final rulemaking, the Department of Labor added that "technical violations of the notice requirements not intended to evade the purposes of WARN ought to be treated differently than either the failure to give notice or the giving of notice intended to evade the purposes of the Act." 54 Fed.Reg. 16042, 16043 (1989). Minor errors, the notice explained, "should not be the basis for liability." *Id.* at 16060.

Courts that have addressed technically deficient WARN Act notices have rejected the "strict compliance" test pressed by Mr. Schmelzer. Instead, they have looked to the purposes underlying the WARN Act and determined whether those purposes were satisfied under the circumstances by the notice that was given to the employees. *See, e.g., Saxion v. Titan-C Mfg., Inc.,* 86 F.3d 553, 561 (6th Cir.1996); *Kalwaytis v. Preferred Meal Sys., Inc.,* 78 F.3d 117, 121 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 73, 136 L.Ed.2d 32 (1996); *Marques v. Telles Ranch, Inc.,* 867 F.Supp. 1438, 1445–46 (N.D.Cal. 1994), *aff'd,* 133 F.3d 927 (9th Cir.1997) (table).

In the *Marques* case, for example, the employer's written notice failed to give the date on which employment would be terminated, failed to state whether the employees would enjoy bumping rights, and failed to provide a name and telephone number of a company official to contact for further information, as required by the regulations. Nevertheless, the court found that because the company was ceasing operations altogether, the question of bumping rights was moot. The court also concluded that the plaintiffs "clearly knew and understood how to contact Defendants because Plaintiffs had done so every season to determine the date harvesting operations were to resume." 867 F.Supp. at 1446. And with respect to the omission of the precise date of employment termination, the court noted that because the notice was sent between harvesting seasons, "the only interpretation of the notice is that it informed the Plaintiffs that they would not be rehired the next season in April 1992." *Id.*

Because the omissions "did not cause harm to the Plaintiffs," the court concluded, "liability should not be imposed." *Id.*

Courts that have addressed notice requirements analogous to the one at issue in this case have likewise rejected "strict compliance" arguments and instead have focused on whether the notice that was given, in light of all the circumstances, satisfied the purposes of the statute or regulation at issue. *See, e.g., Brehmer v. Inland Steel Indus. Pension Plan,* 114 F.3d 656, 662 (7th Cir.1997) ("substantial compliance" satisfies statutory and regulatory requirements regarding notice of denial of an ERISA claim); *Brogan v. Holland,* 105 F.3d 158, 165–66 (4th Cir.1997) (plaintiff received defective notice of denial of an ERISA claim, but was not entitled to relief because he attended meeting at which missing information was provided); *Straub v. A.P Green, Inc.,* 38 F.3d 448, 453 (9th Cir. 1994) (substantial compliance with written notice requirement of Foreign Sovereign Immunities Act achieved because party received actual notice and was not prejudiced by lack of strict compliance with statutory requirements); *Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777, 782–83 (8th Cir.1991) (strict compliance with notice requirements under Perishable Agricultural Commodities Act regulations not required); *McCallin v. United States,* 180 Ct.Cl. 220, 233–34 (1967) (no prejudice from failure to give an employee written notice of his reassignment, where employee was given unequivocal oral notice).

It is clear that Mr. Schmelzer suffered no prejudice as a result of the technical defect in the December 13, 1995, notice. He had actual knowledge that Pitney Bowes was to take over HPO functions on February 14, 1996, and that it was interviewing candidates to work in the new operation. He does not dispute the factual finding that he knew by December 13 or 14, 1995, that his employment with the CAO was to end on February 13, 1996. The purpose of the notification requirement of the WARN Act is to ensure that workers will have "transition time to adjust to their respective loss of employment." 20 C.F.R. § 639.1. It is difficult to

see how the failure to supply a fact already known by the employee undermines that purpose.

In support of his claim of prejudice, Mr. Schmelzer argues that he was misled into believing that he was assured of employment with Pitney Bowes and that the December 13 notice constituted an attempt by CAO to deceive the HPO employees by not providing "a stark statement of their impending termination." Neither contention has any basis in the hearing officer's factual findings or in the evidence in the record. Nothing in the December 13 memorandum suggests that employment with Pitney Bowes was guaranteed, although the great majority of HPO employees who interviewed with Pitney Bowes were in fact offered positions. Moreover, there is no indication that the CAO acted with the intent to deceive the HPO employees about the expected termination date of the HPO operations. The December 13, 1995, Committee resolution specifically stated, in its first sentence, that "all functions of House Postal Operations shall be terminated as of the close of business on Tuesday, February 13, 1996." The fact that CAO posted that resolution on the HPO bulletin board indicates that it was not attempting to conceal the fact or effective date of the planned privatization. Because Mr. Schmelzer suffered no prejudice from the defect in the December 13 memorandum, *i.e.*, he was not deprived of any information that the WARN Act or the applicable regulations required that he have, he is not entitled to relief based on the failure of the December 13 memorandum to comply fully with the regulatory requirements.

*AFFIRMED.*