For the foregoing reasons, I would hold that plaintiffs-appellants have raised legitimate fact questions on whether additional employees should be counted. As a result, I would reverse the district court's grant of summary judgment to defendant and remand the case for trial.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0016P (6th Cir.)
File Name: 00a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL
UNION, LOCAL 7-629,
AFL-CIO, et al.,
        *Plaintiffs-Appellants,*

        *v.*

RMI TITANIUM COMPANY,
        *Defendant-Appellee.*

No. 98-4336

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 92-01679—Paul R. Matia, Chief District Judge.

Argued: November 3, 1999

Decided and Filed: January 12, 2000

Before: MARTIN, Chief Judge; DAUGHTREY, Circuit
Judge; HILLMAN, District Judge.

_____

[*]The Honorable Douglas W. Hillman, United States District Judge
for the Western District of Michigan, sitting by designation.

———————————

**COUNSEL**

**ARGUED:** David A. Santacroce, SUGAR LAW CENTER FOR ECONOMIC AND SOCIAL JUSTICE, Detroit, Michigan, for Appellants. Barton A. Bixenstine, ULMER & BERNE, Cleveland, Ohio, for Appellee. **ON BRIEF:** David A. Santacroce, Julie H. Hurwitz, SUGAR LAW CENTER FOR ECONOMIC AND SOCIAL JUSTICE, Detroit, Michigan, Theodore E. Meckler, Cleveland, Ohio, for Appellants. Barton A. Bixenstine, ULMER & BERNE, Cleveland, Ohio, for Appellee.

DAUGHTREY, J., delivered the opinion of the court, in which MARTIN, C. J., joined. HILLMAN, D. J. (pp. 12-36), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The plaintiffs, Oil, Chemical and Atomic Workers' (OCAW) Union Local 7-629, Kenneth Allen, and a class of OCAW members separated from employment during July and August 1991, advanced a claim for damages under the Worker Adjustment Retraining and Notification Act of 1988 (WARN) against the defendant, RMI Titanium Company. The plaintiffs alleged that by failing to give its employees adequate notice of the layoffs, the company violated provisions of the Act. In response to cross-motions for summary judgment, the district court ruled in the company's favor, finding that the plaintiffs had failed to establish the requisite number of layoffs to trigger the notice provisions under WARN. We affirm.

acknowledge the existence of facts in the record (elicited from defendant's own agents) which directly contradict its present claim that the employees were part-time. First, in its answers to appellants' interrogatories, appellee represented that none of the employees laid off between April 23, 1991 and November 17, 1991 worked less than 20 hours per week in the last 90 days of work or the actual time worked, whichever is shorter. J.A. pp. 178-79. In addition, in the affidavit of Jerome Bennett, attached to appellee's motion for summary judgment and contained in the appendix, Bennett averred that 13 of the 21 employees whose voluntary recall ended between July 22, 1991 and August 21, 1991 were full time employees. Bennett Aff. ¶ 9, J.A. p. 201. Twenty-one of the 27 employees at issue here were returned to layoff on August 5, 1992, and only one other employee's voluntary recall ended during the period between July 22, 1991 and August 21, 1991. J.A. pp. 151-52 (V. Johnson (whose regular layoff date is July 22, 1991) is shown as returning to layoff after voluntary recall on August 19, 1991).

These record statements made by defendant-appellee create a genuine issue of material fact concerning the full-time status of at least 13 or as many as all of the 27 employees who were returned to layoff following voluntary recall between August and September 1991. Accordingly, appellee is not entitled to summary judgment on the basis of this alternative argument.

**III.**

In upholding the district court's grant of summary judgment, the majority gives conclusive weight to the evidence adduced by the employer while disregarding or discounting both circumstantial and direct evidence presented by plaintiffs-appellants. In our judicial system, it is the appointed finders of fact who alone are permitted to sort through such conflicting evidence, to determine credibility, and to make reasonable inferences. Because the majority's decision oversteps its role, and out of respect for the structure of our judicial system, I respectfully dissent.

Activity in the Voluntary Layoff Program, J.A. pp. 150-52. In light of this pattern, defendant-appellee's failure to anticipate that at least two employees would request voluntary layoff during the relevant 90 days was patently unreasonable.

Appellee next claims without discussion that layoffs caused by the voluntary layoff program resulted from a cause that was separate and distinct from RMI's overall economic difficulties. I reject that claim. Although the 27 voluntarily recalled employees were returned to layoff status as the result of the return to work of more senior employees, it is not this change that triggered their employment loss. Instead, as a direct result of RMI's economic difficulties, these employees, once returned to layoff status, lost all opportunity for further recalls. Specifically, as the result of the dramatic number of new layoffs of more senior employees, these employees experienced an employment loss because they lost any reasonable expectation of recall and their previously temporary layoffs were rendered permanent.

Accordingly, while their return to layoff status in and of itself was arguably tied to the separate cause of the more senior employees having voluntarily returned to work under the voluntary layoff program, their *employment loss*, the relevant consideration at issue here, occurred not because they were placed on layoff, but because that layoff was no longer temporary and instead continued for a period of greater than six months. 29 U.S.C. § 2101(6)(B). The employment loss, therefore, was caused not by the voluntary layoff program, but by the same economic causes precipitating the rest of the layoffs occurring during the 90-day period, that is, the accelerating economic downturn of the company.

Appellee's final argument is that all of the 27 employees were part-time employees and therefore were not countable in determining whether a mass layoff occurred. *See* 29 U.S.C. § 2102(a)(3)(B) (excluding part-time employees). In support of its assertions, appellee makes absolutely no citations to the record. Moreover and more significantly, appellee fails to

## I. PROCEDURAL AND FACTUAL BACKGROUND

The facts are largely undisputed. RMI Titanium experienced a downturn in its business beginning in 1990, which precipitated a series of layoffs as part of a continuing reduction in its workforce, beginning with an initial layoff of 60 unionized employees in 1990. In January 1991, the company warned union representatives of the need for further reductions and laid off another 29 employees in February 1991. Despite these efforts, RMI posted losses of $2.5 million in the first six months of 1991.

During the spring of 1991, approximately 197 unionized, non-salaried employees and 72 non-unionized, salaried employees were working full-time at RMI's Metals Plant. Of the unionized employees, 14 senior union members participated in a "voluntary layoff" program negotiated with RMI in 1986 and made available to employees during periods of workforce reduction. Employees taking a voluntary layoff received one month's unpaid leave, subject to renewal, and were replaced by union members previously (involuntarily) laid off from the plant who possessed similar job skills. At the end of the senior employee's voluntary layoff, the replacement was returned to "layoff" status, unless he or she was asked to replace another senior employee.

Of the 72 non-unionized employees working at the Metals Plant during the first half of 1991, approximately 13 employees were assigned to a research and development project referred to internally as the Electrolytic Titanium Project (ETP). The project's objective was the development of a variation on titanium production processes in use at the Metals Plant. RMI shared funding responsibilities for this project with an Italian company, Ginatta Torino Titanium.

The company continued its layoffs during the summer of 1991, laying off 85 additional unionized workers in July and August, and five non-unionized employees, including three members of the ETP team. Also during this time,

approximately 35 senior unionized employees took one- or two-month leaves under the voluntary layoff program; they were replaced by previously separated junior employees recalled from and then returned to layoff status. Apparently, none of the employees laid off during this period received advance notice of their change in job status.

Despite these measures, the company's financial misfortunes continued, and it commenced shutting down some of its production facilities in January 1992. The Metals Plant closed on February 15, 1992. Later that year, the plaintiffs brought this WARN action against RMI, claiming violation of the notice provisions of the Act.

## II. DISCUSSION

### WARN Liability

The Worker Adjustment Retraining and Notification Act provides, in pertinent part, that:

> An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order . . . to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee.

29 U.S.C. § 2102(a) (1994). The purpose of this provision is "to ensure that 'workers receive advance notice of plant closures and mass layoffs that affect their jobs.'" *Kildea v. Electro-Wire Products, Inc.*, 144 F.3d 400, 405 (6th Cir. 1998) (quoting *Marques v. Telles Ranch, Inc.*, 131 F.3d 1331, 1333 (9th Cir. 1997)). Under WARN, an "affected employee" is an employee "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). An "employer" is "any business enterprise that employs . . . 100 or more employees, excluding part-time employees." 29 U.S.C. § 2101(a)(1)(A). An

"unforeseeable business circumstances." Title 29 United States Code, § 2102(B)(2)(A) provides that

> An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

Besides making the blanket assertion that it is protected by the exception, defendant-appellee makes no attempt to analyze the applicability of the statutory provision.

By its plain terms, the quoted exception is designed to provide a mechanism for an employer to engage in a mass layoff with less than 60 days of notice based on circumstances in which an employer had been prevented from projecting the need for or the size of layoffs because business circumstances were not reasonably foreseeable. In other words, the exception provides an escape valve *to the length of notice period required* in those circumstances in which the employer was unable to project the need for mass layoffs 60 days in advance in order to provide the required notice. Here, defendant-appellee instead attempts to use the provision not to excuse the unknown economic necessity for layoffs, but to excuse its need to project with some degree of precision how many employees would use the voluntary layoff program.

Even if the provision could be interpreted to apply to RMI's inability to project how many people might be on voluntary recall, defendant-appellee has failed to create a genuine issue of fact as to whether it was reasonably foreseeable that the number of voluntary layoffs in the 90-day period would equal or exceed two, the total number of additional employees required to trigger a mass layoff under WARN. The record reflects that between September 1990 and September 1991 an average of nine employees per month participated in the voluntary layoff program, and in no month did fewer than three employees participate in the program. *See* Summary of

on layoff, with their original layoff date, while the more senior active employees are treated as remaining on active status. As a consequence, defendant-appellee suggests, the layoffs of these 27 employees as regular employees must be considered under the contract to have occurred prior to the WARN period at issue here, when they were first laid off, and should not be countable as relevant employment losses.

As I previously noted, however, contract rights under the collective bargaining agreement are not affected by and have no effect on the rights of employees under WARN. 29 U.S.C. § 2105. Contractual terms, therefore, may not be used to either expand or contract the statutory language.

In addition, under the regulations, even if these workers are considered temporary replacement employees as opposed to returning laid-off regular employees, they must be counted under WARN as employees for purposes of determining whether a mass layoff has occurred. Pursuant to 20 C.F.R. § 639.3(c)(2),

> Workers, other than part time workers, who are exempt from notice under section 4 of WARN [29 U.S.C. § 2103(1)] are nonetheless counted as employees for purposes of determining coverage as a . . . mass layoff. *For example, if an employer closes a temporary project on which 10 permanent and 40 temporary workers are employed, a covered plant closing has occurred* although only 10 workers are entitled to notice.

(Emphasis added.) For both reasons, I am persuaded that contractual classification of these employees neither has nor could have any bearing on whether they should be counted under WARN for purposes of determining whether a mass layoff has occurred.

Defendant-appellee next contends that even if the 27 employees should otherwise be counted in determining the threshold number under WARN, they fall within a statutory exception to being counted because they were caused by

"employment loss" is "an employment termination, other than a discharge for cause, voluntary departure, or retirement . . . a layoff exceeding 6 months, or . . . a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. § 2101(a)(6).

Certain statutory thresholds apply in order for a layoff or sequence of layoffs to constitute a "mass layoff" and subject an employer to liability under WARN:

> [T]he term "mass layoff" means a reduction in force which --
>
> (A) is not the result of a plant closing; and
>
> (B) results in an employment loss at the single site of employment during any 30-day period for–
>
> (i)(I)   at least 33 percent of the employees (excluding any part-time employees); and
>
> (II) at least 50 employees (excluding any part-time employees); or
>
> (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(2). In order to trigger the notice requirement under this section, if the employer lays off fewer than 500 employees in an action unrelated to a plant closing, the number of employees laid off must exceed 50 and must also exceed 33 percent of the total number of employees. Department of Labor regulations governing WARN enforcement require that these figures be calculated at a "snapshot" date, the date notice is first required to be given. *See* 20 C.F.R. § 639.5(a)(2) (1999). Even where the number of layoffs does not exceed both 50 and 33 percent of the total number of employees, however, layoffs occurring in separate reduction actions may be aggregated into a "mass layoff" if each set of layoffs involves fewer workers than required by

the two statutory thresholds and all layoffs occur within the same 90-day period. *See* 29 U.S.C. § 2102(d). Where this is the case, the employer will be liable under WARN for failure to notify "unless [it] demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of [WARN]." *Id.*

In this case, the parties stipulate that RMI employed 269 workers on the "snapshot" date for the first of the layoffs in question, May 23, 1991. All parties also agree that 85 unionized and two non-unionized employees were laid off during the 90-day period following the initial layoffs, and that these layoffs may be added together to make 87 total layoffs, or 32.34 percent of the total employees. The parties disagree as to the district court's conclusion that neither the layoffs of the three non-unionized members of the ETP team nor the layoffs of 27 OCAW members after temporary recall, events that took place during the same 90-day period, should be counted with the other layoffs in order to reach the "mass layoff" threshold for WARN liability.

### ETP Employees

The appellants argue that the ETP layoffs, like the earlier layoffs of unionized employees, resulted from "[RMI's] continuing loss of income and resulting financial decline" and, therefore, that RMI failed to demonstrate "separate and distinct actions and causes" for the ETP layoffs that would allow it to avoid WARN liability. *See* 29 U.S.C. § 2102(d). RMI argues in response that the layoffs of the three ETP employees were due to the failure of project co-sponsor Ginatta to pay its required share of expenses. The company supported its summary judgment motion on this point with the affidavit of Jerome Bennett, who at the time of the layoffs in question was an RMI executive in charge of employee relations. Bennett's affidavit referred to a letter from John F. Hornbostel, Jr., RMI's general counsel, to Dr. Marco V. Ginatta, dated September 5, 1991, advising Ginatta that, since

unfair to penalize the employer for permitting use of the voluntary layoff program.

I disagree. By the explicit terms of the statute, WARN provisions are to have no effect on contractual rights. *See* 29 U.S.C. § 2105 ("The rights and remedies provided to employees by this chapter are in addition to, and not in lieu of, any other contractual or statutory rights and remedies of the employees, and are not intended to alter or affect such rights and remedies . . . ."). As a result, the reasons for and the existence of a contractual provision governing voluntary layoffs is irrelevant to the interpretation or reach of the statute. Moreover, because the employer was or should have been aware that WARN required the employer to consider the impact on temporarily laid off workers as well as active employees, the employer is not unfairly burdened by considering the impact of its reduction in force on the employment of temporarily laid off workers who had the potential to be voluntarily recalled. Finally, in interpreting statutory language, it is hardly the responsibility of the court to determine what statutory provisions are "fair" in light of the employer's contractual obligations.[2] For all these reasons, the district court erred in concluding that it was unfair to include the 27 employees in the total number of laid off employees.

Defendant-appellee next argues that even if the court rejects the reasoning of the district court, the 27 temporarily recalled employees should be excluded because the contract provides that employees who are temporarily recalled under the voluntary recall program shall be treated as if they remained

---

[2] Further, even were it relevant whether the contract rights at issue inure solely to the employees, the district court's finding that the voluntary layoff program operates solely for the benefit of employees is unsupported by the record. Indeed, the record reflects that the employer paid only the wages to which the replacement worker was entitled, not the rate of the more senior employee on voluntary layoff. Bennett dep., J.A. p. 372. Arguably, at least, the benefits also accrued to the employer.

employment loss as the result of the employer's economic downturn and overall reduction in force. Defendant-appellee's layoffs of substantial numbers of additional employees during July and August 1991 had the effect of eliminating these 27 employees' reasonable expectations of recall and converted their layoffs into qualifying "employment losses" under the statute when they exceeded six months. 29 U.S.C. § 2101(a)(6)(B) (defining an employment loss as a layoff exceeding six months). As a result, they experienced an employment loss at the time their voluntary layoffs in August and September 1991 were rendered permanent. *See Jones*, 748 F. Supp. at 1284-85 (holding that it would be inconsistent with the meaning and purpose of WARN to conclude that temporarily laid off workers were not "affected employees" when their employment was permanently terminated).

I therefore am persuaded that the majority's conclusion that the layoffs of the 27 employees did not constitute a reduction in force misconstrues the structure of the statute and violates the clear statutory language, the purpose of the statute, and the implementing regulations. As a result, I conclude that both the district court and the majority of this court have erred in excluding the voluntarily recalled employees as a matter of law from the mass-layoff threshold count on the basis that the layoffs of these employees resulted in no lost positions.

In light of my conclusion, I must address the alternative rationale offered by the district court in support of its decision, together with the remaining arguments raised by defendant-appellee, but not reached by the district court or the majority of this court.

The district court separately concluded that the counting of the 27 employees would be "unfair" to the employer. The court reasoned that because the voluntary layoff program was a program adopted by the employer as part of the bargaining agreement solely for the benefit of the employees, it would be

monies previously agreed to be provided by Ginatta to RMI "for May and June expenses" had not been received, RMI would "shut down the MX-4 Facility at RMI's Metals Plant in Ashtabula, Ohio, tomorrow, Friday, September 6, 1991." The record indicates that the three employees in question were terminated the following Monday. The district court considered the letter in reaching its decision on the motion, along with Bennett's February 1994 affidavit and September 1993 deposition, in which he attributed the ETP layoffs to problems obtaining funding from Ginatta.

The appellants attempted to rebut RMI's assertions only with the deposition testimony of Warren Jensen, RMI's vice-president of personnel during 1991. Jensen, who was responsible for personnel matters at all five of RMI's plants at the time, stated that RMI's financial losses caused the "large force reductions in [its] salaried work force" during 1991. The record in this case shows that part of his deposition testimony included the following exchange:

Q: Do you know what the reasons were for that large force reduction in the salaried work force that you'd already made?

A: Certainly, it cut costs.

Q: Is it because of decreased sales and decreased profits during this time frame?

A: RMI was very definitely losing money at that time, yes.

We are unable to conclude that these somewhat ambiguous responses are sufficient to bring the three ETP layoffs within the ambit of the notice requirement, because the record fails

to show the context of the questions put to Jensen.[1]  We therefore agree with the district court's determination that OCAW and the other plaintiffs failed to make a showing sufficient to raise a genuine issue of material fact as to RMI's rationale for the September 1991 ETP layoffs. In response to a defendant's summary judgment motion, a plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence '*specific* facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added) (citation omitted).  Here the plaintiffs presented no specific evidence that would credibly controvert the September 5th letter from Hornbostel to Ginatta or offer an opposing theory for why the three ETP employees were terminated.  As to the ETP layoffs then, the district court was correct in finding that they could not be aggregated with the other 87 layoffs in order to meet the threshold for WARN liability.

### Post-"Voluntary Layoff" Terminations

The appellants also argue that 27 unionized employees who returned to layoff status during the 90-day period beginning July 22, after being recalled to cover more senior employees on voluntary layoff, should have been counted as "laid off" under WARN.  RMI does not dispute that the employment status of the 27 employees changed during the 90-day period; rather, it argues that, as a matter of law, "layoffs" resulting from participation in the voluntary leave/temporary recall program should not be counted as layoffs for WARN purposes.

The district court agreed and based its holding for RMI on two alternative grounds.  First, it held that counting the return

---

[1] The quoted material appears at the top of a page of the transcribed deposition. However, the previous pages are missing both from the joint appendix and from the record. We thus have no way to determine whether or not the colloquy was directed toward the ETP employees.

involved).  I therefore am persuaded that the majority's reading of the statute is unsupported by the legislative history. Instead, the legislative history lends further support to the position of plaintiffs-appellants.

At bottom, the majority appears concerned that somehow its sense of "fairness" would be offended to hold that these 27 employees, while temporarily employed, were active employees who experienced an actual layoff during the statutory period, instead of employees who had been laid off well before the large layoffs of the summer of 1991.  This conclusion, however, is neither accurate nor contemplated by the statute and regulations.  To the extent these 27 people were already laid off, they were laid off with expectations of recall based on past notification and industry practice. *See* 20 C.F.R. § 639.3(a)(ii) (defining "reasonable expectation of recall").  As the record reflects, these employees were treated by the employer as regular employees. *See* Bennett dep., J.A. p. 373.  They were recalled with some regularity between their original layoff dates and their final layoffs in August or September 1991. *See* Voluntary Layoff Program Summary of Activity, J.A. pp. 150-52 (showing repeated returns to work for many of the 27 employees during the period between November 1990 and August 1991).  They also knew from experience that the 34 employees immediately preceding them on the seniority list had been recalled to employment by the company on April 15 and April 29, 1991. *See* Recall Lists, J.A. pp. 272-73; Seniority List, J.A. pp. 214-215.  Thus, a reasonable factfinder could conclude that prior to August or September 1991, when their voluntary recall periods ended, these laid-off employees had a reasonable expectation of recall. *See Jones v. Kaiser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1284 (E.D. Tenn. 1990) (the fact that 111 employees were recalled enhanced the expectation of the remaining 159 employees that they also would be recalled); *Damron v. Rob Fork Mining Corp*., 739 F. Supp. 341 (E.D. Ky. 1990).

Moreover, these temporarily laid off employees could experience and did experience a statutorily-defined

the only reading consistent with the treatment of temporarily laid off employees under the regulations. Under 29 C.F.R. § 639.3(a)(ii),

> Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a "reasonable expectation of recall" when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job.

The regulations require a worker on temporary layoff to be counted as an employee whenever that employee has a reasonable expectation of being recalled. *See also Kildea*, 144 F.3d at 407 (holding that "employee" is an individual who is actively working or who is temporarily laid off with a reasonable expectation of recall). Yet the majority would effectively disregard this definition of employee since a job loss to a temporarily laid off worker could *never* result in a reduction in the number of positions available and thus a temporarily laid off person could never be counted for purposes of the threshold mass layoff determination. The majority's reading, therefore, is indisputably contrary to the clear and unambiguous language of the regulations.

In addition, as the majority notes, the legislative history does not discuss or define "reduction in force" or mention the elimination of "positions." That same history, however, clearly reinforces the conclusion that Congress intended a mass layoff to be determined by counting the amount and percentage of employment loss and employees affected, not by counting the amount or percentage of reduction in force or whether positions have been eliminated. *See* H.R. Conf. Rep. No. 100-576, at 1046 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2079 (referring to employment losses and the definitions of employment losses, and justifying notice requirement on disruption to communities and individuals

to layoff status after temporary voluntary recall as a WARN layoff would be "manifestly unfair" to RMI, since RMI had agreed to the voluntary layoff/temporary recall program as a benefit for its unionized employees. Second, the court held that, since Department of Labor regulations implementing WARN define a "mass layoff" as a "reduction in force" that results in an "employment loss" for at least 33 percent of employees at a single site of employment, the return of employees to layoff status after being recalled temporarily could not be considered layoffs contributing to a mass layoff because this action involved no elimination of positions, and hence no reduction in force. Because we agree with the court's reasoning on the second ground, we need not address the first.

The term "reduction in force," used not only in the Labor regulations but in the WARN statute itself, see 29 U.S.C. § 2101(a)(3), is not without ambiguity. Congress did not define the phrase in enacting WARN, nor did the Department of Labor offer clarification when promulgating regulations enforcing WARN. In an employment case involving allegations of age discrimination, however, we defined a reduction in workforce as a situation where "business considerations cause an employer to eliminate one or more positions within the company" and added that "[a]n employee is *not* eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (emphasis added); *see also Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1217 (7th Cir. 1985) ("[B]y definition, when the employer reduces his work force he hires no one to replace the ones he lets go."). Use of the *Barnes* definition, which appears to reflect common parlance, is appropriate in this case because it distinguishes the phrase "reduction in force" from the term "employment loss," also present in WARN's definition of a mass layoff. *See* 29 U.S.C. § 2101(a)(6) (defining "employment loss" as "an employment termination, other than a discharge for cause, voluntary departure, or retirement . . . a layoff exceeding 6 months, or . . . a reduction

in hours of work of more than 50 percent during each month of any 6-month period"). Applying this definition, we conclude that no reduction in force occurred when temporarily-recalled employees were again laid off, because they were replaced by the senior employees returning from voluntary layoff status. This distinguishes these "layoffs" from those of the other 85 unionized employees separated from employment during July and August 1991, undisputedly laid off due to RMI's financial losses and for whom no replacements were hired. Because the return to layoff status of the 27 temporarily-recalled employees involved no reduction in force, we agree with the district court's decision that these "layoffs" may not be added to the other layoffs to create a mass layoff triggering WARN liability.

### III. CONCLUSION

WARN expressly encourages employers to notify employees before permanent layoffs are effected, whether or not the statute's triggering thresholds are met. *See* 29 U.S.C. § 2106 ("It is the sense of Congress that an employer who is not required to comply with the notice requirements of section 2102 of this title should, to the extent possible, provide notice to its employees about a proposal to close a plant or permanently reduce its workforce."). These sentiments were echoed by the Department of Labor in promulgating regulations enforcing the statute. *See* 20 C.F.R. § 639.1(e) ("It is civically desirable and it would appear to be good business practice for an employer to provide advance notice to its workers or unions, local government and the State when terminating a significant number of employees. . . . The Department encourages employers to give notice in *all* circumstances.") (emphasis added). In the summer of 1991, RMI laid off 87 employees with no apparent notice, two terminations short of the number necessary to make this action a mass layoff. In so doing, RMI violated the spirit, if not the letter of the law, providing these workers and their families with no transition time to seek alternative employment or training for work outside the manufacturing

own definition or insertion of these terms to eliminate from the threshold count two substantial groups of employees who expressly were included in a definition Congress *did* make: the definition of employees experiencing an "employment loss." The majority's interpretation flies in the face of general principles of statutory construction under which the court is required to give meaning to all terms in a provision and to interpret one statutory term in a manner that will not conflict with other terms.

Moreover, contrary to the majority's tortured reading of the statutory language to limit definitions adopted by Congress, a straightforward reading of the statute permits giving meaning to all terms, including "reduction in force" and "employment loss." The use of "reduction in force" in the statute is solely a means of describing a significant elimination of jobs *"which . . . is not the result of a plant closing."* The resulting effect of this reduction in force is separately described under the statute as the number and percent of employees experiencing an employment loss.

As a result, even accepting that the term "reduction in force" requires — as the majority holds — that actual job elimination must occur in order for a "mass layoff" to occur — no dispute exists that a reduction in force has occurred during the layoffs at RMI in the summer of 1991. At least 87 employees undisputedly lost their positions and were not replaced during the economic downturn experienced by RMI. Thus, a "reduction in force" unquestionably has occurred. The remaining issue is whether that reduction in force "results in an employment loss . . . for . . . at least 33 percent of the employees . . . ." In other words, as the statute unambiguously states, the definition does not require a reduction in force of 33 percent of the positions. It requires a reduction in force resulting in an employment loss for 33 percent of the employees.

This reading of the statute is not only a preferred reading of the language and structure of Congress' definition, it also is

concludes that because the 27 temporarily recalled employees were replaced by the returning senior employees, they may not be counted as part of a reduction in force. The majority therefore concludes that it need not determine whether these employees have experienced an "employment loss" as defined by the statute.

The majority's interpretation of the statutory "reduction in force" language renders redundant, or meaningless in most circumstances, the statutory requirement that the employer determine whether a particular percentage of the employees has experienced an "employment loss." Under the broad definition of "employment loss" contained in the statute, layoffs of more than six months (as opposed to layoffs of less than six months) and certain reductions in hours of work both amount to "employment losses" covered by the statute. *See* 29 U.S.C. § 2101(a)(6). Yet such statutorily defined employment losses typically would not result in a loss of a position (*i.e.*, a reduction in force under the majority's rule). As a result, under the majority's rule, an employee on a layoff of less than six months who, during the statutory "mass layoff" period, had his layoff converted to a layoff of more than six months would never be counted as an employee — and he therefore would never experience a countable employment loss for determining a mass layoff — because his loss would never result in the loss of a position, since he already was on layoff. Similarly, an employee who had his work hours reduced more than 50 percent in each month of any six-month period would never be counted because his "employment loss" would never result in the actual elimination of a position. Thus, despite the clear Congressional definitions of the persons counted as employees who experience employment losses under the statute, the majority would render those definitions meaningless.

Nowhere in the statute did Congress define "reduction in force" and nowhere in the statute did Congress mention the elimination of "positions." Yet the majority would rely on its

sector, and causing almost a decade's worth of ensuing litigation.[2]

Nevertheless, RMI has won the numbers game these parties ultimately played. We agree with the district court that there is no genuine issue of material fact that RMI terminated 87 employees within the 90-day period beginning July 22, 1991, and that only these layoffs may be counted toward triggering the 33 percent threshold for purposes of WARN's advance notification provision. As a matter of law, then, the aggregated layoffs did not count as a mass layoff under WARN for which affected employees must be notified. We therefore AFFIRM the judgment of the district court granting summary judgment in the defendant's favor.

---

[2]*See* 20 C.F.R. § 639.1(e) ("It is . . . prudent for employers to weigh the desirability of advance notice against the possibility of expensive and time-consuming litigation to resolve disputes where notice has not been given.").

———————————

### DISSENT

———————————

DOUGLAS W. HILLMAN, District Judge, dissenting. Despite the apparent ease with which the majority disposes of plaintiffs-appellants' claims, I am persuaded that plaintiffs-appellants have presented sufficient evidence to create a genuine issue of material fact whether defendant-appellee engaged in a mass layoff as defined by the Worker Adjustment Retraining and Notification Act ("WARN"), 29 U.S.C. § 2101(a)(3)(B)(i)(I). Consequently, I am satisfied that the district court's grant of summary judgment to the employer was error, and I respectfully dissent.

### I.

As the majority observes, many of the facts involved in this case are undisputed. I concur in the overview of the procedural and factual background, as set forth in Section I of the majority opinion. However, I am persuaded that the majority has misstated or failed to acknowledge a wide range of factual considerations during the course of its discussion of legal issues under Section II of the opinion. In addition, the majority has failed to explain how its conclusions are consistent with an entire reading of the statutory definition of "mass layoff" or with the statute's implementing regulations. Therefore, for the reasons set forth in the remainder of this opinion, I dissent from part II and from the conclusion reached by the majority opinion.

### II.

The purpose of the WARN act is to "ensure that 'workers receive advance notice of plant closures and mass layoffs that affect their jobs.'" *Kildea v. Electro-Wire Products, Inc.*, 144 F.3d 400, 405 (6th Cir. 1998) (quoting *Marques v. Telles*

including at times serving as temporary recalls to fill positions made available when more senior employees took advantage of the company's voluntary layoff program provided under the contract. J.A. pp. 370-71. Under the voluntary layoff program, regularly employed but more senior employees could, if they wished, elect to accept voluntary layoff for a 30-day period if an employee on temporary layoff was available and qualified to fill the position. *Id.*

As noted, the 27 employees at issue here undisputedly were returned to layoff status during the 90-day period after July 22, 1991, after the more senior employees they had replaced returned to work. The majority holds that these temporarily recalled employees who were again laid off may not be counted to determine whether a mass layoff occurred because their layoffs, after voluntary recall, did not amount to a loss in a position in the workforce, and thus did not constitute a "reduction in force" under the statutory definition.

I respectfully suggest that the majority's reading of the statute distorts the plain meaning of the provision when read as a whole and that such reading further conflicts with the applicable regulations. As previously noted, a "mass layoff" is defined in relevant part as a "reduction in force which . . . is not the result of a plant closing; and . . . results in an employment loss for . . . at least 33 percent of the employees . . . ." 29 U.S.C. § 2101(3)(B)(i). The majority, in singling out the words "reduction in force" acknowledges that the phrase is not defined either in the statute or legislative history. Nevertheless, the majority concludes based on cases considering the employee's evidentiary burden in reduction in force cases alleging age discrimination, that when an individual has been replaced, he or she may not be considered to have been eliminated as part of a reduction in force. *Citing Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) ("An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge). Applying that reasoning, developed in an entirely separate context for entirely different reasons, the majority

credibility challenges and inconsistencies in the employer's proffered explanation, the majority denies plaintiffs-appellants their day in court and the opportunity for effective cross-examination of defendant-appellee's witnesses regarding those inconsistencies. The majority surprisingly grants conclusive weight to the employer's explanation simply because it has claimed that the three salaried ETP employees were laid off for a separate and distinct reason from the remaining 87 employees — effectively relieving defendant-appellee of its statutory obligation to *prove* that the proffered reason for the ETP layoffs was the true reason for those layoffs.

For all of these reasons, I am persuaded that the evidence is more than sufficient to withstand summary judgment. Plaintiffs are entitled to a jury determination of the reason for defendant-appellee's layoffs of ETP employees.

**B.   *Voluntarily Recalled Employees***

Plaintiffs-appellants also assert that the trial court committed error when it held as a matter of law that an additional 27 unionized employees, who were laid off during the relevant time period after having been temporarily recalled, should not be counted for purposes of determining whether a mass layoff has occurred. The majority affirms the district court, a decision from which I respectfully dissent.

The 27 employees at issue initially were temporarily laid off on either October 1, 1990 or November 19, 1990, well before the date of the first layoffs at issue in this case. J.A. pp. 151-52. Like all temporarily laid off employees, the 27 continued to be listed as employees of the company and were considered regular employees of the company. *See* Plant Seniority List, J.A. pp. 215-16; Bennett dep., J.A. p. 373.

As temporarily laid off employees, the 27 employees were required to report their availability for work. *See* Notices of Layoff, J.A. pp. 147-48. They were eligible to be recalled by the company when the company deemed it necessary,

*Ranch, Inc.*, 131 F.3d 1331, 1333 (9th Cir. 1997). Under WARN,

> [a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order . . . to each representative of the affected employees as of the time of the notice or . . . to each affected employee . . . .

29 U.S.C. § 2102(a). A mass layoff that involves more than 50 employees and fewer than 500 employees is defined as

> a reduction in force which . . . is not the result of a plant closing and . . . results in an employment loss at the single site of employment during any 30-day period for . . . at least 33 percent of the employees (excluding any part-time employees) . . . .

29 U.S.C. § 2101(a)(3)(B)(i)(I). The required employment loss of § 2101(a)(3) is defined as

> an employment termination, other than a discharge for cause, voluntary departure, or retirement, . . . a layoff exceeding 6 months, or . . . a reduction in hours of work of more than 50 percent during each month of any 6-month period.

29 U.S.C. § 2101(a)(6).

Pursuant to the regulations developed under WARN, in determining the number of employees (and thereby the percentage of employees involved in a layoff) an employer may be said to employ,

> [w]orkers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a "reasonable expectation of recall" when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and

that he/she will be recalled to the same or to a similar job.

20 C.F.R. § 639.3(a)(ii).

As the majority observes, the regulations set a "snapshot" date upon which the calculations of numbers of employees and numbers of employees experiencing an "employment loss" shall be calculated. *See* 20 C.F.R. § 639.5(a)(2). That date is the date 60 days preceding the first layoffs triggering the duty to provide notice.

In the instant case, the parties agree that the relevant "snapshot" notice date is May 23, 1991. The parties also stipulate (for purposes of this appeal) that RMI employed 269 employees on the "snapshot" date. As a result, for purposes of this appeal, it is undisputed that 89 employees must have experienced a countable employment loss during the relevant period in order to trigger the notice requirement of the statute. The district court found and the parties have not appealed that at least 87 employees experienced a countable employment loss during the relevant statutory period.

At issue, therefore, is whether at least two additional employees may be considered to have experienced a countable employment loss during the relevant period. If so, then all agree the provisions of WARN are applicable.

Plaintiffs-appellants contend here, as they did below, that two additional groups of employees, both of which include more than two employees, must be counted in determining the number of affected employees. First, plaintiffs-appellants assert that three additional salaried employees in the Electrolytic Titanium Process ("ETP") Department, a research and development project, also were laid off during the relevant period for the same reason as the other 87 employees. Defendant-appellee contends and the majority holds that, as a matter of law, the three ETP employees were laid off for a separate and distinct reason and therefore may not be considered to be part of the mass layoff.

salaried work force reductions before October 3, 1991 (which included ETP layoffs) had been made for a single reason — to cut costs.

In sum, plaintiffs-appellants provided three separate types of challenges to defendant-appellee's explanation for the ETP layoffs: (1) the statutory presumption that temporally connected layoffs have the same cause; (2) inconsistencies between defendant-appellee's conduct and its proffered explanation, which cast substantial doubt on the credibility of the explanation; and (3) testimony in which defendant-appellee's vice-president for personnel failed to distinguish the ETP layoffs in circumstances in which one reasonably could conclude he would have claimed such a distinction if it were true. In ignoring the presumption under the statute as well as the circumstantial evidence tending to undermine the employer's explanation, the majority engages in a restrictive reading of the statute to the benefit of the employer and to the obvious detriment of employees. Such a restrictive reading is particularly inappropriate where, as here, the statute is remedial in nature and must be interpreted in favor of the class it is designed to benefit. *See, e.g., United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 439 (D. Mass. 1995); *Washington v. Aircap Indus. Corp.*, 831 F. Supp. 1292, 1295 (D.S.C. 1993).

The court also disregards the Supreme Court's mandate on summary judgment:

Credibility determinations, the weighing of evidence, *and the drawing of legitimate inferences from the facts* are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, *and all justifiable inferences are to be drawn in his favor.*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added). In declining to consider the reasonable

asked directly and separately about the treatment of the salaried ETP employees.

To the contrary, Jensen's testimony provides some credible evidence that defendant-appellee's explanation is not worthy of belief. Jensen testified about the explanation for salaried workforce layoffs that he gave to union officials shortly after the ETP layoffs, when he allegedly referred to "the large force reductions . . . made to our salaried workforce." In his presentation in October 1991 and at his deposition, Jensen, a vice-president of defendant company, made no attempt to distinguish any one group of salaried employee layoffs from any other. A failure by RMI's vice-president for personnel to distinguish the ETP layoffs — which RMI now contends were made for a different reason — is itself suggestive that no different reason did in fact exist. *Cf.* Fed. R. Evid. 801(d)(2) & Advisory Committee Notes (including as statements the failure to speak under circumstances in which a reasonable person would do so).

Moreover, Jensen's remaining answers, while susceptible of more than one interpretation, may be read as an unambiguous response to plaintiffs' questions regarding the reasons for the salaried work force layoffs that had been made before October 3, 1991:

Q   Did you know the reasons for the large work force reductions in the salaried work force that you'd already made?

A   *Certainly*, it cut costs.

Q   Is it because of decreased sales and decreased profits during this time frame?

A   RMI was very definitely losing money at that time, *yes*."

J.A. p. 348 (emphasis added). When read together, Jensen's explanations may reasonably be interpreted to mean that *all*

Second, plaintiffs-appellants contend that 27 non-salaried employees, who already were on temporary layoff during the period preceding the layoffs beginning July 22, 1991, also should be counted. These employees were on temporary layoff, but had been recalled as part of a voluntary layoff program provided in the collective bargaining agreement. Under the voluntary layoff program, more senior employees could voluntarily take layoff status for 30-day periods, during which periods they would be replaced by previously laid off, more junior employees. At the end of the 30-day recall periods, these 27 voluntarily recalled employees were again laid off when the senior employees returned to work. However, when laid off at this time (on either August 5, 1991 or September 2, 1991), these employees were laid off permanently. Plaintiffs therefore assert that these 27 employees experienced an employment loss within the meaning of WARN that was caused by the same reason as the other 87 layoffs, *i.e.* economic downturn. Defendant-appellee asserts and the majority holds that, as a matter of law, the 27 non-salaried employees may not be considered to have been part of a reduction in force and therefore may not be counted.

I disagree with the majority's conclusion regarding both groups of employees.

## A.   *ETP Employees*

Defendant-appellee asserts that the three ETP employees laid off on September 14, 1991, were laid off for a separate and distinct reason other than the economic downturn causing the layoffs of the other 87 employees. Defendant-appellee contends therefore that as a matter of law the three ETP employees may not be counted in determining whether a mass layoff has occurred.

In determining whether a mass layoff has occurred, the statute mandates the aggregation of all layoffs occurring within a 90-day period, unless the employer is able to prove both that the cause of a particular layoff is separate and

distinct and that the employer's actions are not taken to avoid the requirements of WARN:

> [I]n determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period *shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter*.

29 U.S.C. § 2102(d) (emphasis added).  In other words, the statute creates a rebuttable presumption that multiple layoffs occurring within a 90-day period are the result of the same cause.  Moreover, while the statute does not specify the meaning of the phrase "separate and distinct actions and causes," courts have concluded that "layoffs occasioned by a continuing and accelerating economic demise are not the result of separate and distinct causes." *United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 435-36 (D. Mass. 1995).

In the instant case, the employer argues that the ETP department was jointly funded by the employer and an Italian partner company, Ginatta Torino Titanium ("GTT"). Defendant-appellee asserts that the three ETP employees were laid off as a result of GTT's failure to pay its share of the costs of operating the department.  In support of its asserted independent reason for layoff of the ETP employees, defendant-appellee proffered the affidavit of Jerome Bennett, stating that the three ETP employees were laid off on September 14, 1991, "due to a funding problem involving an outside company.  As reflected in the RMI documents attached as Exhibits G and H."  J.A. p. 205 ¶ 22.    The

Jensen testified that at the time of his meeting with union representatives in early October, he had been questioned about both the company's treatment of and its plans for the salaried workforce.  Jensen testified that at this meeting he had displayed an exhibit on the overhead projector showing workforce reductions to salaried employees.  The relevant portion of Jensen's deposition testimony discussing the October 1991 meeting is somewhat broader than the colloquy quoted by the majority:

A.  We — during the course of our discussion on October 3rd, somebody from the union . . . raised the question, well, what was going to be done with the salaried people? In response to such questions, such comments, I used an overhead, *an exhibit showing the large force reductions that had taken place — that we had made in our salaried work force.*

Q  *You'd already made?*

A  *Already made.  Correct.*

Q  Do you know what the reasons were for that large force reductions in the *salaried* work force that you'd already made?

A  Certainly, it cut costs.

Q  Is it because of decreased sales and decreased profits during this time frame?

A  RMI was very definitely losing money at that time, yes.

J.A. p. 348 (emphasis added).  The majority concludes that the quoted language is insufficient to create a genuine issue of fact as to whether the salaried ETP employees were laid off for the same or different reasons.  Specifically, the majority concludes that Jensen's testimony would only undermine defendant-appellee's proffered explanation if Jensen had been

that the funding issues with GTT were either resolved or acquiesced to by RMI.[1]

Further, contrary to what the majority states, defendant-appellee did not lay off the three employees on "the following Monday" after the threatened shutdown date, September 6, 1991. Instead, the company did not lay off any employees until September 14, 1991, nine days after the letter was written and eight days after the supposed shutdown. Bennett Aff., J.A. p. 205 ¶ 22 (stating that employees were laid off on September 14, 1991).

As a result, a reasonable jury would be entitled to conclude that the stated explanation by the employer that the three employees were laid off for reasons other than economic reasons was not credible because the stated reason was inconsistent with what the company actually did. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (credibility determinations and the drawing of legitimate inferences is for the jury, not the court). The mere fact that RMI threatened a partner in order to coerce payment of monies owed does not establish that RMI's actions short of the threat (that is, laying off three employees instead of shutting down the project) were taken for the threatened reason. The jury therefore would be entitled to infer from the circumstantial evidence alone that the proffered explanation was not the true reason for the layoffs and that defendant-appellee had failed to prove that the presumption under the statute was overcome.

Moreover, to further bolster their claim of pretext, plaintiffs-appellants produced the deposition testimony of Warren Jensen, appellee's vice-president of personnel.

---

[1] It is noteworthy that the record contains no assertion by the company that the monies owed by GTT were never paid. *See* Bennett dep., J.A. pp. 362-63 (stating only that project experienced "*intermittent shortages* of money based upon the commitment that the Italians had made to fund some portion of it." (Emphasis added.)

referenced Exhibit H consists of a letter dated September 5, 1991 from RMI's Vice-President, General Counsel and Secretary, John F. Hornbostel, Jr., to a representative of GTT stating

This is to advise you that in accordance with the agreement reached between RMI and GTT in your meeting with Fred Gieg on August 28, 1991, here in Niles and further in a conversation that Fred had with you yesterday, it was definitely agreed that unless RMI received by Thursday, September 5, 1991, the amount of $382,796.94, which is payment for May and June expenses, that RMI, upon such non-receipt, would shut down the MX-4 Facility at RMI's Metals Plant in Ashtabula, Ohio, tomorrow, Friday, September 6, 1991.

Since we haven't yet received the money as promised by you, we will proceed with the shutdown.

J.A. p. 247.

On the basis of the affidavit and the letter, both the district court and the majority hold that, as a matter of law, the three ETP employees were laid off for a different and distinct reason than the other 87 employees, who were laid off because of the economic conditions in the company and the market. I disagree.

As previously noted, the statute creates a presumption that multiple layoffs occurring during a 90-day period have the same cause and should be aggregated for purposes of determining whether a mass layoff has occurred. *See* 29 U.S.C. § 2102(d) ("employment losses for 2 or more groups . . . which occur within any 90-day period *shall be considered to be . . . a mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.*") (emphasis added). *See also* H.R. Conf. Rep. No. 100-576, p. 1050 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2083 (using words

"presumptively" and "presumption"). The employer is permitted by statute to prove that a separate cause occasioned certain layoffs. The burden of proof, however, is placed squarely on the employer. *Id.* The employer's explanation, therefore, is nothing more than an alternative explanation which, if challenged as to credibility, creates a typical fact question for the jury to resolve. If the jury were to find the explanation not to be credible, defendant-appellee would have failed in meeting its burden of proof and plaintiffs-appellants would be entitled to aggregate the ETP layoffs.

As a result, an employer's claimed alternative reason is not entitled to presumptive truthfulness. At best, the employer's proffered explanation may be given no more weight than is given the "legitimate nondiscriminatory explanation" an employer is required to articulate in response to a prima facie case of discrimination under Title VII, 42 U.S.C. § 2000(e). *See, e.g. Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (applying circumstantial evidence test for proving discrimination, including employer's burden to articulate nondiscriminatory explanation, and discussing manner in which plaintiff may prove the explanation is pretextual). A plaintiff may show pretext by producing "sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.* at 1083. As the courts repeatedly have observed, in Title VII, ADEA and ADA actions, plaintiffs-appellants are not required to introduce direct evidence to challenge the credibility of any evidence, including the employer's explanation. *Id.* at 1083 (stating that parties need not show directly that the illegal reason was the actual reason, but instead may challenge the credibility of the explanation, thereby creating inference that real reason was an impermissible one). Direct evidence of illegal purpose generally is not available. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) (ADEA case) ("Rarely can discriminatory intent be ascertained through direct evidence because rarely is such evidence available."). Instead, plaintiffs are entitled to dispute defendant's explanations with the sort of circumstantial evidence and reasonable inferences

used to challenge credibility in other contexts. *Id.* ("It is the rare situation when direct evidence of discrimination is readily available, thus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof.").

Further, plaintiffs' burden of proving motive under WARN unquestionably is lower than that burden under federal discrimination statutes. Although the means for demonstrating pretext under the two models may be somewhat parallel, the burden of proving motive under WARN is placed on the employer, whereas under Title VII, the burden of proof remains always on plaintiffs. *See* 29 U.S.C. § 2102(d). As a result, under WARN the employer bears the burden of demonstrating that the proffered explanation is *not* pretextual.

Here, plaintiffs-appellants have raised substantial credibility challenges to the employer's stated reason for the layoffs of the ETP employees. First, the explanation given by the employer for its actions is inconsistent with its own conduct. In the September 5, 1991 letter to GTT, defendant-appellee threatened to shut down the operation of the entire ETP program on September 6, 1991 unless the GTT immediately paid the monies owed. Defendant-appellee, however, did not shut down the ETP program on September 6, 1999 as threatened. Instead, the company laid off only three of the department's 13 employees, a pattern more consistent with the overall economic downsizing in the plant than with the threatened shutdown of a department. In addition, in contrast with the representations contained in the letter that the project would be shut down on September 6, 1991, the company did not shut down the program until February 1992, at approximately the same time it closed the entire plant. Bennett Dep., J.A. pp. 363-64 (project closed at about the same time as the plant). This action is in direct contravention of the threatened shutdown date and suggests